FLORENCIO RODRÍGUEZ MELÉNDEZ y CARMEN J. RODRÍGUEZ ROSARIO, apelantes, *v.* SUPERMERCADO AMIGO, INC., ETC., apelados.

*Número:* CE-87-834          *Resuelto:* 24 de abril de 1990

*Florencio Rodríguez Meléndez, pro se,* apelante; *Vicente J. Antonetti* y *José M. Lorie Velasco,* de *Goldman & Antonetti,* abogados de Supermercados Amigo, Inc. y del Sr. Ángel Negrón, apelados;

*María Isabel Córdova Iturregui,* abogada de Eagle Star Insurance Company of P.R., apelada.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El 18 de septiembre de 1985 Florencio Rodríguez Meléndez y su esposa Carmen J. Rodríguez Rosario —ambos por sí y en representación de su hija menor de edad, Carmen L.— presentaron en el Tribunal Superior, Sala de Carolina, demanda en daños y perjuicios contra Supermercados Amigo, Inc., su aseguradora y el Sr. Ángel Negrón.(1)

En esencia, alegaron que Carmen L. fue víctima de hostigamiento sexual y obligada a renunciar de su empleo en dicha empresa debido al clima opresivo y de persecución en su contra creado por el señor Negrón, gerente de la sucursal de Ciudad Universitaria en Trujillo Alto. Sostuvieron que dicha conducta configuró un discrimen por razón de sexo según la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. secs. 146–151), y contrario a nuestra Constitución.

La fiel adjudicación de este delicado y sensitivo asunto exige una referencia detallada al trasfondo fáctico y procesal fundamentado en un análisis cuidadoso y esmerado de la prueba disponible en esta etapa.

I

En algún momento durante el año 1984,(2) luego de obtener el permiso requerido por el Departamento del Trabajo y Recursos

---

(1) Reclamaron para ella las sumas siguientes: $10,000 por salarios dejados de percibir; $40,000 por la pérdida de ingresos futuros, y $100,000 por concepto de sufrimientos, inseguridad, pérdida de autoestimación, lesión a su dignidad, honra y reputación y otras angustias mentales y daños morales. Además, para cada uno solicitaron $50,000 en concepto de angustias mentales y daños morales. Apéndice del Escrito de Apelación, págs. 6 y 7.

(2) El ilustrado tribunal de instancia (Hon. César W. Cordero Rabell, Juez) señala, en sus determinaciones de hecho, que fue el 30 de julio. Sin embargo, en su alegato, los demandantes sostienen que fue en enero. La cuestión no es determinante en la adjudicación del recurso.

Humanos por razón de su minoridad, Carmen L. comenzó a trabajar como cajera a tiempo parcial en la sucursal de Berwind de los Supermercados Amigo, Inc. situada en la Avenida 65 de Infantería en Río Piedras. A la sazón, Carmen L. —quien tenía diecisiete (17) años de edad— era estudiante de escuela superior. Su trabajo, además de ayudarle económicamente, le permitía cumplir con el requisito académico del curso de Distribución y Mercadeo.

Al cabo de tres (3) meses, aprobó su período probatorio y fue nombrada empleada *regular* a jornada parcial. Luego de siete (7) meses en Berwind, solicitó y fue trasladada a la sucursal localizada en la Urbanización Ciudad Universitaria en Trujillo Alto. En ésta se desempeñaba como gerente el codemandado señor Negrón.[3]

Alegadamente desde que Carmen L. inició sus labores en Ciudad Universitaria, el señor Negrón la miraba insistente y sospechosamente. Señalan que luego de varios incidentes —a los que nos referiremos más adelante— éste "inició un período de persecución contra Carmen, manifestado por críticas continuas sobre su labor y largas horas de trabajo sin descanso, ni tiempo para que ella resolviera sus necesidades biológicas". Alegato de los demandantes-apelantes, pág. 3.

Finalmente, *nueve (9) días después de evaluar positivamente a Carmen L. para su curso de escuela*, le solicitó que renunciara a su trabajo para evitar ser despedida por varios descuadres de caja que supuestamente había cometido.

Ante ese cuadro de sufrimiento e incertidumbre, el 4 de octubre de 1984 los demandantes presentaron una querella ante la Unidad Antidiscrimen del Departamento del Trabajo y Recursos Humanos. Once (11) meses después, por temor a que prescribiera su reclamo, presentaron la acción que nos ocupa.

Subsiguientemente, el ilustrado foro de instancia (Hon. César N. Cordero Rabell, Juez) declaró con lugar la Moción de Senten-

---

[3] Su pedido de traslado obedeció a que dicha sucursal estaba localizada en la misma urbanización en que ella residía con sus padres.

cia Sumaria presentada por los codemandados y el 17 de noviembre de 1987 desestimó la demanda. En su sentencia pormenorizó los incidentes alegadamente constitutivos de hostigamiento sexual. Para ello utilizó la transcripción de una deposición tomada a Carmen L., declaraciones juradas de Víctor Chardón Ramos —Director de Recursos Humanos— y Aileen Suárez Fajardo y Erasmo Rodríguez Calderón, ambos técnicos de personal. Además, tuvo ante sí varias acciones disciplinarias contra Carmen L. por descuadres reportados como cajera. Examinemos los incidentes.

El primero ocurrió apenas transcurrida una semana del traslado. Ella se disponía a entrar a una oficina en el segundo piso del supermercado y el señor Negrón se le acercó y, mientras le *pasaba la mano por el cabello*, le dijo: "'ay chiquilla linda'" y la saludó. Apéndice del Escrito de Apelación, pág. 14. Ella lo esquivó y sin mediar más palabras dio por terminado el incidente.

El segundo suceso se refiere a que el señor Negrón le manifestaba que no se maquillara porque se veía mejor sin maquillaje. Esa clase de sugerencia era repetitiva. Al decir de Carmen L., ocurría "cada vez que yo llegaba al supermercado", al menos una (1) o dos (2) veces en la semana. Apéndice del Escrito de Apelación, pág. 15.

El tercer suceso ocurrió en ocasión de la menor ir a buscar su cartera a la oficina. El Sr. Ángel Negrón estaba allí, sentado en una silla giratoria detrás del mostrador. Al entrar Carmen L., éste inclinó la silla hacia atrás, se colocó las manos sobre la cabeza y le dijo: "'Ay Carmencita tengo dolor de cabeza, quítamelo . . . .'" Apéndice del Escrito de Apelación, pág. 17. Ella le contestó que allí había pastillas y salió atemorizada del lugar. Mientras salía, él le indicó que no le gustaban las pastillas.

El cuarto incidente se suscitó un sábado alrededor de las 7:00 A.M. cuando se proponía "ponchar" su tarjeta de asistencia. Sintió que alguien abría la puerta del almacén ubicada al lado del departamento de productos lácteos, muy cerca del ponchador. Resultó ser el señor Negrón. Éste se dirigió inmediatamente hacia Carmen L. y, *tocándole el pelo, la cara y el cuello*, le dijo:

"'que bonita eres'." Apéndice del Escrito de Apelación, pág. 18. Ella, amedrentada, decidió ponchar en ese momento —aunque faltaban varios minutos para su hora de entrada— y poder salir del área del almacén. De inmediato fue a la oficina e informó de lo sucedido al señor Correa, subgerente de la sucursal. Ante esta situación, el señor Negrón se reunió con el subgerente y con ella *para excusarse por cualquier malentendido que hubiese surgido en relación con el incidente del almacén.*

Finalmente, Carmen L. señaló que el señor Negrón constantemente le "echaba" piropos. Con frecuencia le señalaba lo bien que le quedaba la ropa, en especial el color rojo. Indicó, que en una ocasión le comentó sobre lo bien que le quedaba cierto color de lápiz labial. Añadió también que el señor Negrón le decía tantas "boberías" que muchas veces ella se abstenía de prestarle atención. Sin embargo, aclaró —bajo juramento— que éste nunca la invitó a salir, que en ningún momento le insinuó que deseaba sostener relaciones sexuales ni que tampoco le verbalizó un piropo vulgar u ofensivo. Por último, de las alegaciones y de la deposición tomada a Carmen L. surgió que, aun cuando fue originalmente evaluada de manera *excelente,* es con posterioridad a estos incidentes con el señor Negrón que recae la evaluación negativa que eventualmente desemboca en el requerimiento de la empresa a que renunciara. En cuanto a este extremo, consignó —como materia controversial— la ocurrencia de los alegados descuadres y el método seguido para el cuadre de caja y su evaluación.

El tribunal sentenciador rechazó la posibilidad de la existencia de un patrón de conducta de claro contenido sexual suficientemente severo como para crear un ambiente hostil e intimidante en el trabajo de la demandante. A la luz de la doctrina jurisprudencial prevaleciente, concluyó que la *naturaleza trivial* de los incidentes aludidos era insuficiente para sostener una causa de acción por hostigamiento sexual en el empleo. Al mismo tiempo negó que se hubiese configurado un ataque abusivo a alguno de los valores protegidos por el Art. II, Sec. 8 de nuestra Constitución, L.P.R.A., Tomo 1.

A solicitud de los demandantes, revisamos.

## II

■ La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, consagra el derecho de toda persona a la protección contra ataques abusivos a su honra, reputación y vida privada o familiar. Ésta dispone lo siguiente:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. Const. E.L.A., *supra,* ed. 1982, pág. 257.

En el ámbito obrero-patronal, dichos preceptos constitucionales fueron recogidos por la citada Ley Núm. 100. Ese estatuto prohíbe en Puerto Rico el discrimen en el empleo por razón de edad, raza, color, sexo, origen o condición social e ideas políticas y religiosas. En lo pertinente, su Art. 1 dispone:

> Todo patrono que despida, suspenda o *discrimine* contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, *condiciones o privilegios de su trabajo,* o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo *o que afecten su status como empleado,* por razón de edad, según ésta se define más adelante, raza, color, *sexo,* origen social o nacional, condición social, ideas políticas o religiosas del empleado o solicitante de empleo:

> (a) incurrirá en responsabilidad civil. (Énfasis suplido.) 29 L.P.R.A. sec. 146.

■ No albergamos dudas de que el hostigamiento sexual constituye una modalidad del discrimen por razón de sexo proscrito por la Ley Núm. 100, *supra.* A fin de cuentas, hostigar es sinónimo de perseguir o molestar, actuación que necesariamente conlleva diferente trato hacia una persona; esto es, de índole discriminatorio en su contra.

Aclarado este extremo, notamos la ausencia de precedentes jurisprudenciales en nuestra casuística para determinar el tipo de

conducta que constituye hostigamiento sexual. Ello nos mueve a acudir a la legislación y jurisprudencia persuasiva en el ámbito federal.(4)

## III

En el año 1964, el Congreso aprobó la Ley Federal de Derechos Civiles, 42 U.S.C. secs. 2000e-1 a 2000e-17. Su Título VII prohíbe la utilización de prácticas discriminatorias en el empleo. Específicamente veda el discrimen por razón de raza, color, religión, origen nacional y *sexo*.

Dos (2) opiniones del Tribunal Supremo federal, a principios de la década del '70, dejaron meridianamente clara la intención congresional. En *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), dicho Foro señaló que su aprobación pretendía "eliminar toda barrera artificial, arbitraria e innecesaria, específicamente cuando dichas barreras indudablemente operan para discriminar a base de una clasificación de tipo racial o de otro tipo igualmente impermisible". (Traducción nuestra.) Más tarde, en *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 esc. 13 (1978), sentó la tónica siguiente:

> Al prohibir a los patronos que discriminen contra individuos por razón de sexo, el Congreso tenía la intención de *asestar un fuerte golpe a todo el espectro de tratamiento dispar que se da a hombres y mujeres como resultado de estereotipos sexuales.* La Sec. 703(a)(1) somete a escrutinio y elimina tales impedimentos irracionales a las oportunidades y disfrute del empleo que han agobiado a la mujer en el pasado. (Traducción y énfasis nuestros.)

Sin embargo, aun con el beneficio de estos pronunciamientos, los tribunales de instancia comúnmente rehusaban reconocer las causas de acción presentadas por empleados alegadamente hostigados. *Corne v. Bausch & Lomb, Inc.*, 390 F. Supp. 161 (D. Ariz.

---

(4) En el momento de surgir la presente causa de acción, no existía legislación que pautara el hostigamiento sexual en el empleo. Al presente, la misma se encuentra en la Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. sec. 155 *et seq.*).

Nuestros pronunciamientos no deben entenderse como expositivos del ámbito de responsabilidad y sus diversas modalidades establecidas en la referida Ley Núm. 17.

1975); *Miller v. Bank of America*, 418 F. Supp. 233 (N.D. Calif. 1976); *Tomkins v. Public Service Elec. & Gas Co.*, 422 F. Supp. 553 (D. N.J. 1976); *Fisher v. Flynn*, 598 F.2d 663 (1er Cir. 1979).

En respuesta a esta falta de uniformidad en la adjudicación de casos en donde se alegaba la existencia de hostigamiento sexual en el empleo, la Comisión de Igualdad de Oportunidades de Empleo (*Equal Employment Opportunity Commission*, en adelante E.E.O.C.) emitió unas guías que sirvieron de norte a los tribunales.

Por su importancia, estimamos prudente reproducirlas en su totalidad:

. (a) El hostigamiento sobre la base de sexo es una violación a la Sec. 703 del Título VII. Avances sexuales que no son bien recibidos, solicitudes de favores sexuales y cualquier otra conducta física o verbal de naturaleza sexual, constituye hostigamiento sexual cuando (1) el aceptar tal conducta es explícita o implícitamente un término o condición para el empleo de un individuo, (2) *el aceptar o rechazar dicha conducta por parte de un individuo se utiliza como base para tomar decisiones sobre empleo que afectan a tal individuo* o (3) dicha conducta tiene el propósito o *efecto de interferir irrazonablemente con la realización del trabajo de un individuo* o crear un ambiente de trabajo intimidante, hostil u ofensivo.

(b) Al determinar si una alegada conducta constituye hostigamiento sexual, la Comisión considerará el *récord completo y la totalidad de las circunstancias*, tales como la naturaleza de las proposiciones sexuales y el contexto en que ocurrieron los alegados incidentes. La determinación de la legalidad de una acción particular se hará a base de los hechos y caso por caso.

(c) Al aplicar los principios generales del Título VII, un patrono, agencia de colocaciones, comité de aprendices u organización laboral (en lo sucesivo mencionadas colectivamente como "patrono") es responsable por sus actos y por aquellos de sus agentes y supervisores con respecto al hostigamiento sexual independientemente de si los actos específicos de los cuales se protesta estuviesen autorizados o hasta prohibidos por el patrono e independientemente de si el patrono conocía o debió conocer de su existencia. La Comisión examinará las circunstancias de la relación laboral específica y de los trabajos realizados por el individuo para determinar si un individuo actúa en capacidad de supervisor o de agente.

(d) Con respecto a la conducta entre colegas, un patrono es responsable por actos de hostigamiento sexual en el centro de trabajo donde el patrono (o sus agentes o supervisores) conoce o debió conocer la conducta, a menos que pueda mostrar que tomó la acción correctiva apropiada inmediatamente.

(e) Un patrono puede también ser responsable de los actos de personas que no son sus empleados, con respecto al hostigamiento sexual de empleados en el centro de trabajo, cuando el patrono (o sus agentes o supervisores) conoce o debió conocer la conducta y no toma la acción correctiva apropiada inmediatamente. Al revisar estos casos, la Comisión considerará la extensión del control del patrono y cualquier otra responsabilidad legal que pudiese tener el patrono con respecto a la conducta de dichas personas que no son sus empleados.

(f) La prevención es la mejor herramienta para eliminar el hostigamiento sexual. Un patrono debe tomar todos los pasos necesarios para evitar el hostigamiento sexual, tales como trayendo el tema afirmativamente, expresando una fuerte desaprobación, elaborando las sanciones apropiadas, informando a los empleados de su derecho a traer el asunto y cómo traer el asunto de hostigamiento bajo el Título VII y desarrollando métodos para crear conciencia en todas las personas implicadas.

(g) Otras prácticas relacionadas: cuando se conceden oportunidades o beneficios porque un individuo ha aceptado las proposiciones sexuales del patrono o sus solicitudes sexuales, puede que el patrono sea responsable de discrimen ilegal por razón de sexo contra otras personas que están cualificad[a]s pero a quienes se les negó la oportunidad o el beneficio de empleo. (Traducción y énfasis nuestros.) 29 C.F.R. sec. 1604.11 (1983).

A raíz de la aprobación de dichas guías, dos (2) importantes opiniones de los Tribunales de Circuito federal insuflaron nuevos bríos a la definición de hostigamiento sexual. En *Bundy v. Jackson*, 641 F.2d 934 (Cir. D.C. 1981), la demandante alegó que luego de rechazar varias proposiciones de varios de sus supervisores comenzó a recibir críticas en su trabajo y se le negó en diversas ocasiones la posibilidad de recibir un ascenso. El Tribunal, fundamentándose mayormente en las guías promulgadas por el E.E.O.C. y en la opinión de *Barnes v. Costle*, 561 F.2d 983 (Cir. D.C. 1977), concluyó que cuando *sin una válida justificación*, el sexo constituye un factor determinante en una decisión relacio-

nada con el empleo de una persona, existe tal discrimen. Resolvió, además, que de acuerdo con la doctrina de *Rogers v. Equal Employment Opportunity Com'n*, 454 F.2d 234 (5to Cir. 1971), la frase "términos y condiciones de empleo" incluye el ambiente de trabajo. De acuerdo con tal teoría, no es necesario demostrar la existencia de perjuicios económicos. Los daños sicológicos y emocionales provocados por el ambiente de trabajo son suficientes para sostener la reclamación.

Un (1) año más tarde, *Henson v. City of Dundee*, 682 F.2d 897 (11mo Cir. 1982), reafirmó la doctrina establecida en *Bundy v. Jackson*, supra, en cuanto a que la creación de un ambiente de trabajo hostil por medio de hostigamiento sexual puede, por sí solo, servir de fundamento para una reclamación por discrimen por razón de sexo, al amparo de las disposiciones del Título VII de la Ley Federal de Derechos Civiles de 1964, *supra*. Al respecto se señaló:

El hostigamiento sexual que crea un ambiente hostil u ofensivo para los miembros de un sexo constituye la misma barrera arbitraria contra la igualdad sexual en el lugar de trabajo, que el hostigamiento racial es para la igualdad racial. De hecho, el requisito de que un hombre o una mujer sufran abuso sexual a cambio del privilegio de poder trabajar y ganarse la vida, puede ser tan humillante y desconcertante como los más agrios epítetos raciales. Un patrón de hostigamiento sexual infligido sobre un empleado debido a su sexo es un patrón de conducta que inflige un tratamiento dispar a un miembro de un sexo con respecto a los términos, las condiciones o los privilegios del empleo. No es necesario que un empleado sujeto a tal trato dispar pruebe además que ha sufrido un detrimento tangible en su empleo.

Nuestra conclusión de que una atmósfera hostil u ofensiva creada por el hostigamiento sexual puede, por sí sola, constituir una violación al Título VII queda reforzada a base de una decisión reciente del Tribunal de Apelaciones de los Estados Unidos para el Distrito de Columbia. (Traducción nuestra.) *Henson v. City of Dundee*, supra, pág. 902.

Sin embargo, la opinión de *Henson v. City of Dundee*, supra, fue más allá. En lo referente a la responsabilidad del patrono, ese tribunal concluyó que si el hostigamiento ocasiona un ambiente de

trabajo hostil para el demandante, éste debe demostrar que el patrono conocía o debió conocer de los alegados actos y que no tomó las precauciones necesarias para evitarlo. Íd., pág. 905. Dicho conocimiento podrá probarse mediante evidencia demostrativa de que el empleado afectado notificó de la situación a la alta gerencia o que la situación era tan grave que el patrono debió conocerla (*inference of knowledge or constructive knowledge*). Íd.

Luego de estas opiniones, los tribunales mostraron estar más receptivos a un enfoque liberal. *Katz v. Dole*, 709 F.2d 251 (4to Cir. 1983); *Phillips v. Smalley Maintenance Services, Inc.*, 711 F.2d 1524 (11mo Cir. 1983); *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77 (3er Cir. 1983); *Horn v. Dukes Homes, Div. of Windsor Mobile Homes*, 755 F.2d 599 (7mo Cir. 1985); *King v. Palmer*, 778 F.2d 878 (Cir. D.C. 1985); *Moylan v. Maries County*, 792 F.2d 746 (8vo Cir. 1986).

Eventualmente, la proliferación de decisiones en los tribunales de apelaciones allanó el camino para que el Tribunal Supremo federal se pronunciara en *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). Allí, por voz del entonces Juez Asociado Señor Rehnquist, dicho Foro concluyó que Mechelle Vinson había sido víctima de hostigamiento sexual en su empleo con el Banco. Esa decisión se adoptó ante los hechos siguientes. Vinson trabajó en el Banco desde 1974 hasta 1978, fecha en que fue despedida por alegadamente haber abusado de una licencia por enfermedad que le había sido concedida. Luego demandó al Banco y a su supervisor Sidney Taylor. Alegó que a insistencias de Taylor, y por temor a perder su trabajo, accedió a tener con él relaciones sexuales. *Durante los cuatros (4) años que laboró en el Banco tuvo relaciones íntimas con Taylor en unas cuarenta (40) o cincuenta (50) ocasiones.* Además, indicó que Taylor la seguía al baño de las damas, le coqueteaba frente a otros empleados y la obligó en varias ocasiones a sostener relaciones involuntariamente. Finalmente, aclaró que nunca notificó la conducta de Taylor por miedo a perder su trabajo. El Tribunal de Distrito desestimó la demanda bajo el razonamiento de que si Taylor y Vinson sostuvieron relaciones sexuales íntimas, éstas fueron totalmente voluntarias y

sin ninguna relación con su permanencia en el empleo. En vista de ello, negó la existencia de hostigamiento sexual y, por consiguiente, la posible violación al Título VII de la Ley Federal de Derechos Civiles, *supra.*

El Tribunal de Apelaciones revocó la opinión del Tribunal de Distrito, y el Tribunal Supremo la confirmó. En su opinión, el Juez Rehnquist destaca tres (3) puntos fundamentales.

Primero, con vista al caso de *Los Angeles Dept. of Water & Power v. Manhart,* supra, aclaró que el lenguaje utilizado en el Título VII de la Ley Federal de Derechos Civiles, *supra,* no está limitado al discrimen económico o tangible. A tales efectos reiteró que la intención del Congreso fue erradicar todo el espectro de trato desigual entre hombres y mujeres. Por tal razón, no es necesario que un demandante demuestre que el alegado hostigamiento haya ocasionado un efecto económico negativo en su empleo. Basta que se haya creado un ambiente hostil de trabajo mediante la conducta del alegado hostigador. Al así señalarlo, sin ambajes el Tribunal adoptó las normas establecidas en las guías emitidas por el E.E.O.C. citadas anteriormente.

Explicó, además, que a la luz de lo resuelto en los casos *Bundy v. Jackson,* supra, y *Henson v. City of Dundee,* supra, no todo tipo de conducta o lenguaje es suficiente para sostener una alegación de hostigamiento sexual por la creación de un ambiente hostil. Dicho hostigamiento debe ser lo suficientemente severo como para alterar las condiciones de empleo y crear un ambiente de trabajo desfavorable para la víctima.

■ Segundo, el Tribunal resolvió que a base de las guías interpretativas emitidas por la E.E.O.C., el juzgador de hechos deberá examinar la totalidad de las circunstancias que rodean el caso, evaluar la naturaleza de las proposiciones y el contexto en que ocurrieron los incidentes. 29 C.F.R. sec. 1604.11(b) (1983). Según este enfoque, concluyó que el hecho de que la querellante hubiese actuado "voluntariamente" al sostener relaciones sexuales con el hostigador no era defensa. Para establecer la existencia de hostigamiento, lo determinante es que las proposiciones o los

avances sexuales no hayan sido bienvenidos (*unwelcome*). 29 C.F.R. sec. 1604.11(a) (1983). "La pregunta correcta es si la demandante, mediante su conducta, demostró que las alegadas proposiciones sexuales no fueron bien recibidas, y no si su participación real en la relación sexual fue voluntaria." (Traducción nuestra.) *Meritor Savings Bank v. Vinson*, supra, pág. 68.

■ Finalmente, como tercer punto, el Tribunal Supremo declinó establecer una regla definitiva de responsabilidad patronal. Sin embargo, expresó que estaba de acuerdo con la posición de la E.E.O.C. sobre la aplicabilidad de los principios de agencia (*agency*) como guías en la determinación de responsabilidad potencial de un patrono por los actos llevados a cabo por sus supervisores. A su vez, señaló que aunque hay límites en cuanto a la imposición de responsabilidad al patrono por los actos de sus empleados, la ausencia de notificación o conocimiento de los hechos no lo libera automáticamente de responsabilidad. Además, aclaró que tampoco lo libera de responsabilidad el solo hecho de la existencia de una política antidiscriminatoria y un procedimiento de querellas. Estos factores, aunque importantes, no son determinantes.

Esta trayectoria jurisprudencial, altamente persuasiva en materia de hostigamiento sexual, nos permite elucidar y refinar ciertos conceptos atinentes.

## IV

■ El hostigamiento sexual en el empleo puede manifestarse de varias maneras. No obstante, la casuística federal consistentemente ha reconocido dos (2) modalidades: el hostigamiento sexual por ambiente hostil y el hostigamiento *equivalente* (quid pro quo).

■ En la primera vertiente, el hostigamiento sexual se produce cuando la conducta sexual para con un individuo tiene el efecto de interferir irrazonablemente con el desempeño de su trabajo o de crear en el mismo un ambiente intimidante, hostil u

ofensivo. A su amparo, la justiciabilidad de una reclamación por ambiente hostil no requiere que dicha conducta produzca un daño económico. *Meritor Savings Bank v. Vinson*, supra. Tampoco es indispensable que dicha conducta sea de naturaleza explícitamente sexual. En este tipo de casos basta con que el hostigamiento o trato desigual se dirija al individuo únicamente por razón de su sexo. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10mo Cir. 1987); *McKinney v. Dole*, 765 F.2d 1129 (Cir. D.C. 1985).

■ A fin de cuentas, la pregunta de umbral en toda reclamación de acuerdo con esta modalidad es si la alegada conducta constitutiva de hostigamiento fue lo suficientemente severa y ofensiva como para alterar las condiciones del empleo y crear un ambiente de trabajo abusivo. Este examen debe realizarse atendiendo a la totalidad de las circunstancias y, muy en particular, a factores tales como la naturaleza de la conducta alegada, su frecuencia e intensidad, contexto en el cual ocurre, período de tiempo y su extensión, y la conducta y circunstancias personales del demandante. *Meritor Savings Bank v. Vinson*, supra; *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6to Cir. 1986); *Scott v. Sears, Roebuck and Co.*, 798 F.2d 210 (7mo Cir. 1986); *Henson v. City of Dundee*, supra; *Bundy v. Jackson*, supra; *Ross v. Double Diamond, Inc.*, 672 F. Supp. 261 (N.D. Tex. 1987). Por consiguiente, el asunto a decidir es si la conducta degradante, así como los gestos y las expresiones sexuales, han causado en el demandante tal ansiedad y han debilitado su estima propia y confianza, que han contaminado impermisiblemente las condiciones del empleo.

■ Por su parte, el hostigamiento sexual *equivalente* (quid pro quo), se produce cuando el sometimiento o el rechazo de los avances o requerimientos sexuales se toma como fundamento para afectar beneficios tangibles en el empleo. Según la misma, se requiere que el demandante pruebe la solicitud de favores sexuales o el sufrimiento de avances de igual tipo, y que el sometimiento o rechazo a dichos avances o a la referida solicitud haya sido la causa de una decisión adversa en cuanto a una condición o al

término de su empleo. *Hicks v. Gates Rubber Co.*, supra; *Henson v. City of Dundee*, supra. De igual modo se reconoce la existencia de una reclamación por hostigamiento sexual *equivalente* (quid pro quo) cuando el demandante logra establecer que las deficiencias en el desempeño de su labor —por lo cual es despedido u obligado a renunciar— son consecuencia directa del ambiente hostil en el que se vio obligado a trabajar. *Broderick v. Ruder*, 685 F. Supp. 1269 (D. D.C. 1988); *Hicks v. Gates Rubber Co.*, supra.

Aclarados estos extremos, nos resta determinar cuál debe ser la medida (*standard*) de responsabilidad aplicable al patrono en casos de hostigamiento sexual por uno de sus agentes o supervisores.[5] En *Meritor Savings Bank v. Vinson*, supra, la opinión mayoritaria sugiere, sin resolverlo, que la responsabilidad del patrono debe ser absoluta en casos de hostigamiento sexual (quid pro quo), mientras que de acuerdo con la modalidad de ambiente hostil lo será sólo si conocía, o razonablemente debió conocer, lo que estaba ocurriendo y no hizo nada para corregirlo o evitarlo. No es necesario incorporar este criterio de responsabilidad dual a nuestra jurisdicción.[6]

La Ley Núm. 100, *supra*, establece una presunción de discrimen. Su Art. 3 dispone:

> Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de las secs. 146 a 151 de este título, cuando los mismos hayan sido realizados sin justa causa. Esta presunción será de carácter controvertible. 29 L.P.R.A. sec. 148.

---

[5] Para los fines de este análisis, el concepto "agente" incluye a todo aquel individuo con una autoridad suficiente para tomar decisiones a nombre del patrono y, por ende, se constituye en su "alter ego".

[6] Sobre un excelente análisis y crítica de este criterio, véase Nota, *Employer Liability Under Title VII for Sexual Harrassment after Meritor Savings Bank v. Vinson*, 87 (Núm. 6) Colum. L. Rev. 1258 (1987). Para críticas a la doble medida (*standard*), véanse: J.L. Dolkart y E.L. Malchow, *Sexual Harrassment in the Workplace: Expanding Remedies*, 23 Tort & Ins. L.J. 181 (1987); Nota, *Between the Boss and a Hard Place: A Consideration of Meritor Savings Bank, FSB v. Vinson and the Law of Sexual Harrassment*, 67 (Núm. 3) B.U.L. Rev. 445 (1987); Comentarios, *Meritor Savings Bank v. Vinson: Sexual Harrassment at Work*, 10 Harv. Women's L.J. 203 (1987).

Y en *Ibáñez v. Molinos de P.R., Inc.*, 114 D.P.R. 42, 53 (1983), pautamos así la forma en que se puede refutar esta presunción:

En este contexto, la presunción establecida por nuestra Ley Núm. 100, contra discrimen, significa que el patrono demandado viene obligado a probar que el despido *no* fue discriminatorio. Nuevamente es preciso señalar la diferencia con la doctrina federal. En nuestra jurisdicción no es necesario que el patrono afirmativamente "articule" una explicación razonable para el despido, aunque en la práctica ésta sería la forma más certera y conveniente de destruir la presunción. Basta con que pruebe, aun mediante evidencia circunstancial, que la razón para el despido *no* fue discriminatoria para que la presunción quede destruida. Esto último, sin embargo, ha de hacerse mediante preponderancia de la prueba, lo que representa un *quantum* mayor de prueba que el exigido en la jurisdicción federal.

■ Resolvemos que la Ley Núm. 100, *supra*, es el instrumento adecuado para dirimir la controversia planteada en el caso de autos.

V

Los principios doctrinales esbozados nos mueven a decidir que incidió el tribunal de instancia al desestimar sumariamente la demanda.

■ Sabido es que el mecanismo de la sentencia sumaria es un remedio útil que se concede sólo cuando el tribunal tiene ante sí, de manera incontrovertible, la verdad sobre todos los hechos esenciales. Cuando de las alegaciones, deposiciones y admisiones, junto con las declaraciones juradas —si las hay— u otros documentos pertinentes surge que existe una controversia *bona fide* de hechos, no procede una sentencia sumaria. De haber duda en cuanto a la existencia de una controversia real, la misma debe resolverse en contra de la parte que la solicita. *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1987); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986); *Valcourt Questell v. Tribunal Superior*, 89 D.P.R. 827 (1964); *Roth v. Lugo*, 87 D.P.R. 386 (1963). Aquí la sentencia sumaria no procedía.

Primeramente, la prohibición contra el hostigamiento sexual en el empleo es una cuestión que responde a política pública de raigambre constitucional y debe ser examinada rigurosamente por los tribunales.(7) Así, su fiel adjudicación requiere un análisis *detenido* y *cuidadoso* de los hechos, pues están involucrados factores humanos relativos a actitudes, conductas, móviles, sentimientos y otros, que difícilmente pueden precisarse a menos que se ventilen en un juicio plenario. Segundo, la evidencia presentada por los codemandados no demostró que los incidentes no ocurrieron o que no fueron motivados única y exclusivamente por razón del sexo de Carmen L. Estamos, pues, ante una controversia mixta de hecho y de derecho. Requiere aclarar en sus méritos si la conducta del señor Negrón constituyó o no hostigamiento sexual y si alteró intangiblemente los términos y las condiciones del empleo. Finalmente, hay que examinar si más allá de los descuadres iniciales, su repetición luego del traslado —único fundamento para haberle requerido posteriormente la renuncia— ocurrió como consecuencia del referido ambiente. Estas interrogantes no podían ser adjudicadas sumariamente. Procede remitirlas a una vista evidenciaria para su depuración. *McKinney v. Dole*, supra.

## VI

Esta decisión responde al análisis objetivo antes expuesto. Aclaramos, no obstante, que su adjudicación no significa una abstracción de los rasgos distintivos y peculiares de nuestra cultura y sus repercusiones en la conducta social e individual de los miembros de la sociedad puertorriqueña. Tampoco incide en la dinámica de las relaciones interpersonales *normales* entre hombre y mujer, sean ajenas o dentro del ámbito laboral.

---

(7)  Prueba de ello es la aprobación de la Ley Núm. 17, *supra*. Entre otros, tuvo el propósito de dejar claramente establecida, como política pública, la prohibición contra el hostigamiento sexual en el empleo. Informe Conjunto de las Comisiones de lo Jurídico Civil sobre Asuntos de la Mujer y del Trabajo y Asuntos del Veterano a la Cámara de Representantes.

■ *Las diferencias culturales no justifican que se lesione la dignidad del ser humano, principio básico universal.* Bajo el manto de la cultura, la historia ha atestiguado graves injusticias que el hombre en su avance civilizador eventualmente ha denunciado, rechazado y remediado. Y es que la cultura no es un producto pasivo e inmutable, como tampoco puede servir de rémora al desarrollo social. Forjada por el propio ser humano, por imperativo ha de ajustarse a los valores de los nuevos tiempos.

Por siglos se fue asentando la conducta que hoy denominamos "hostigamiento sexual en el empleo". En el pasado asumió otras formas crudas. Desde el amo que hostigaba a sus esclavas y el poderoso hacendado que abusaba de la hija del "arrimao" hasta el disminuido requerimiento sexual por el patrono a la empleada doméstica, fueron sólo algunas de las formas "aceptadas" por sectores de la sociedad bajo el prisma de que eran manifestaciones normales y naturales de nuestra idiosincrasia cultural. Cruentas luchas sociales, el advenimiento de nuestra Constitución y la intervención del legislador fueron necesarias para que al presente esas prácticas se consideren cosas de un pasado ya superado. El cambio social se ha operado. *El ordenamiento jurídico, hasta muy recientemente desfasado de esta nueva realidad social, ha evolucionado e incorporado la normativa necesaria para que otras modalidades de hostigamiento sexual en el empleo —algunas sofisticadas— que antes nos negábamos a reconocer, pierdan la aureola de manifestaciones culturales aceptables.*

*Se dictará sentencia revocatoria y se devolverán los autos para la continuación de los procedimientos compatibles con estos pronunciamientos.*

El Juez Asociado Señor Hernández Denton emitió opinión concurrente y el Juez Asociado Señor Alonso Alonso concurre con el resultado sin opinión escrita. El Juez Presidente Señor Pons Núñez emitió opinión disidente.

—o—

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Coincidimos con la opinión del Tribunal de que la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. secs. 146–151, proscribe el hostigamiento sexual por constituir una manifestación del discrimen en el empleo por razón de sexo. Sin embargo, en la Parte IV de la opinión del Tribunal, y sin una explicación adecuada, este Alto Foro se abstiene de emitir un pronunciamiento en cuanto a la norma de responsabilidad aplicable al patrono en los casos de hostigamiento sexual. Por entender que debemos pronunciarnos sobre estos extremos y así cumplir con nuestra responsabilidad de formular directrices que ayuden a los tribunales de instancia a adjudicar este tipo de controversia, suscribimos esta opinión concurrente.

Analizar la dimensión jurídica del hostigamiento sexual en el empleo requiere que reconozcamos que el término está vinculado a un extenso debate en la sociedad moderna sobre la posición preponderante del hombre en el ejercicio de la autoridad familiar y en la esfera económica. Aunque el problema es de origen antiguo, no ha sido hasta recientemente, con el desarrollo del movimiento feminista, que se ha comenzado a examinar sus rasgos y a proscribir alguna de sus manifestaciones mediante legislación.

La transformación socioeconómica del país desde 1940 ha implicado unos cambios profundos en la naturaleza del trabajo, el tipo de destrezas requeridas y el incremento en la demanda de mujeres trabajadoras para posiciones que tradicionalmente eran ocupadas por hombres, en particular en los sectores profesionales y gerenciales. La incorporación masiva de la mujer en los sectores productivos requirió un cambio en la visión tradicional de la mujer con un énfasis en su capacidad reproductiva y en su responsabilidad primaria en la crianza de los niños. Véanse: Rivera Quintero, *The Development of Capitalism of Women in the Labor Force*, en E. Acosta Belén, *The Puerto Rican Woman*, Nueva York, Ed. Praeger, 1979, págs. 8–24; Ruiz, *Cambios en el patrón de empleo*

*femenino por sector industrial y por ocupación, durante el proceso de desarrollo económico de Puerto Rico,* Puerto Rico Occupational Information Coordinating Committee, 1989.

Como resultado de estos cambios, la tasa de participación femenina en la fuerza laboral aumentó sustancialmente durante las primeras tres (3) décadas del Siglo XX y luego en 1980. "En la actualidad las mujeres representan un 43% de todas las personas empleadas en la manufactura, un 42% del sector de finanzas, seguros y bienes raíces y un 28% de los empleados en el comercio al detal. Más notable aún es la presencia de la mujer en el sector de los servicios profesionales (65%) y en la administración pública (38%)." I. Picó Vidal, *Derecho de familia y cambio social: una interpretación histórico-social de la reforma de la administración de bienes gananciales,* LV Rev. Jur. U.P.R. 537, 551 (1986).

Paralelo a esta incorporación de la mujer en los modos de producción, la sociedad reconoció gradualmente sus justos reclamos de igualdad jurídica y política, y en 1952 la Constitución del Estado Libre Asociado proclamó el principio de la inviolabilidad de la dignidad del ser humano y prohibió la discriminación por raza, color, *sexo,* nacimiento, origen o condición social. Véase I. Picó Vidal, *The History of Women's Struggle for Equality in Puerto Rico,* en Acosta Belén, *op. cit.,* págs. 25–37.

## II

Aunque la generalidad de las discriminaciones existentes en un país no se corrigen automáticamente por una exhortación constitucional, esta declaración trazó unos principios generales que guiaron la acción gubernamental en la década del 1970 en defensa de los derechos de la mujer.

En 1970 la comisión especial nombrada por ambas cámaras legislativas para investigar el discrimen contra la mujer trabajadora reconoció la existencia del problema y la necesidad de un estudio abarcador de los factores sociales, culturales y legales que lo originaban. Por encomienda de la Asamblea Legislativa, la Comisión de Derechos Civiles preparó un estudio abarcador del

tema que sentó los fundamentos para la reformulación de la legislación social aplicable a la controversia de autos. Su conclusión es particularmente relevante a la situación factual que origina este recurso:

Nuestro estudio demuestra que existe el discrimen contra la mujer que trabaja fuera del hogar y que las prácticas discriminatorias toman las más sutiles y engañosas apariencias. Es por ello que tampoco basta con el estudio de las leyes *vis-à-vis* las disposiciones constitucionales. La legislación y la declaración constitucional son instrumentos que pueden utilizarse para ayudar a corregir la situación pero no ofrecen por sí solas totalmente las soluciones. Así lo confirma el hecho de que persista en Puerto Rico la situación que revelan las estadísticas citadas a pesar de que la Constitución del Estado Libre Asociado de Puerto Rico desde el año 1952 prohíbe el discrimen por razón de sexo, exige igual paga por igual trabajo y garantiza a toda persona la igual protección de las leyes. (Escolio omitido.) Comisión de Derechos Civiles, *La igualdad de derechos y oportunidades de la mujer puertorriqueña*, 1972, pág. 7.

Ese mismo año la Asamblea Legislativa respondió a las recomendaciones de la Comisión de Derechos Civiles y enmendó la Ley Núm. 100, *supra*, a los fines de prohibir el discrimen en el empleo por razón de sexo por patronos y organizaciones obreras. Véase Ley Núm. 50 de 30 de mayo de 1972 (29 L.P.R.A. sec. 146). Según enmendada, la ley vigente prohíbe que cualquier patrono *"despida, suspenda o discrimine* contra un empleado suyo en relación a su *sueldo*, salario, jornal o compensación, *términos, categorías, condiciones o privilegios* de su trabajo . . . por razón de edad . . . , raza, color, *sexo*, origen social o nacional, condición social, ideas políticas o religiosas del empleado o solicitante de empleo". (Énfasis suplido.) 29 L.P.R.A. sec. 146.

Al promulgar esta enmienda, la Asamblea Legislativa atendió los justos reclamos de miles de mujeres obreras que aspiraban a una igualdad de derechos y a la eliminación de barreras económicas, sociales y culturales que limitaban o codicionaban sus oportunidades de trabajo y su acceso a posiciones de alta jerarquía empresarial.

Entre estos obstáculos posiblemente la más nociva a la dignidad de la mujer trabajadora es el hostigamiento sexual en el empleo. Aunque en nuestra sociedad la intimidación sexual de la mujer tiene múltiples manifestaciones, es en los talleres de trabajo donde el abuso adquiere unas dimensiones alarmantes:

> En la muestra del estudio de Muñoz antes descrito el 61.2% de las informantes indicó haber sido víctima de hostigamiento sexual en el marco de su centro de empleo y el 16.3% informó conocer a otras mujeres que habían sido acosadas sexualmente en su centro de empleo, para un total de 77.6% que informó haber sido víctima de hostigamiento sexual o al menos haber conocido casos del mismo en los centros de empleo.

.     .     .     .     .     .     .     .

> Los estudios sobre el hostigamiento en los centros de trabajo sugieren, además, que la mayor parte del mismo proviene de jefes o de personas en posiciones de mayor poder que la mujer (Bishop y otros, 1982). En la muestra de Muñoz (1984) el 87.5% de los hostigadores estaban claramente ubicados en posiciones superiores: unos como gerentes o como supervisores inmediatos, otros como clientes de alto rango en la empresa; comparados con 21.4% que eran compañeros de trabajo de igual o parecido rango ocupacional. M. Muñoz Vázquez y R.M. Silva Bonilla, *El hostigamiento sexual: sus manifestaciones y características en la sociedad, en los centros de empleo y los centros de estudio*, Centro de Investigaciones Sociales, Universidad de Puerto Rico, Río Piedras, 1985, págs. 8–12.

En su vertiente obrero-patronal el hostigamiento sexual implica que la mujer, para obtener unos beneficios accesibles a los otros obreros, tiene que escoger entre rechazar el privilegio y poner en peligro su trabajo o someterse a unas condiciones ilegítimas y humillantes para obtener el privilegio. Un estudio reciente del Centro de Investigaciones Sociales de la Universidad de Puerto Rico confirma la tragedia vivida por las víctimas y su particular vulnerabilidad a la intimidación sexual en el empleo:

> Con el empleo de los recursos de la intimidación y del insulto sexual los hostigadores muchas veces logran paralizar total o parcialmente a sus víctimas, inhibiéndolas de una cabal comprensión de atropello y del abuso de poder que enfrentan, e impidiéndoles el desarrollo de respuestas más a tono con la situación enfrentada.

Muchos de los relatos anteriormente incluidos nos ilustran el uso y el efecto de esos mecanismos. Vemos a través de ellos que muchas trabajadoras optan por renunciar a su trabajo, o tienen que enfrentar un ambiente de trabajo hostil y degradante, antes que enfrentar cabalmente al hostigador dentro de su marco contextual.

. . . . . . . . .

En los últimos relatos incluidos . . . vemos la gravedad de los efectos que estos intentos de ataque sexual provocan en las trabajadoras víctimas de los mismos. Se trata no sólo de efectos económicos adversos, como lo es la secuela de renuncias por parte del personal vulnerable. Esa gama de efectos adversos puede incluir intentos de suicidio por parte de la víctima, una fuerte pérdida en la capacidad para poder volver a relacionarse de modo cómodo con los demás, una dificultad para establecer los vínculos afectivos . . . , el desarrollo de depresiones recurrentes, la dependencia de fármacos para hacer la vida tolerable, en fin: el tener que enfrentarse a una vida que les parece degradada y sin sentido.

. . . . . . . .

. . . También nos provoca una intensa preocupación por no poder identificar cómo es que lo hemos provocado, cómo es que hemos fallado en proyectar la imagen de dignidad y decoro que según se nos ha enseñado a pensar y sentir, hubiese podido evitar nuestra vulneración. *Es por eso que en los diversos relatos aparecen por regla general comentarios que indican esa confusión, ese bochorno, ese coraje —que no es sólo con el hostigador sino con ellas mismas, por creer que no han sabido "protegerse"— y paralelo a esos sentimientos, un gran sentido de degradación personal.* (Énfasis suplido.) L. Martínez, R.M. Silva Bonilla, I. Alegría, *et al.*, *El hostigamiento sexual de las trabajadoras en sus centros de empleo*, Centro de Investigaciones Sociales, Río Piedras, 1988, págs. 82–85.

En su dimensión sociológica el término "hostigamiento" incluye diversas presiones no deseadas que abarcan una amplia gama de actuaciones. Sin embargo, concebido el hostigamiento como una presión o acercamiento de naturaleza sexual *no deseada*, éste constituye una modalidad de discrimen por razón de sexo si se convierte de forma implícita o explícita en un término o condición de trabajo de una persona. En una relación de poder entre un supervisor y una empleada, la imposición del requisito de someterse o aceptar un acercamiento sexual *no deseado* para decidir respecto a su empleo también es realmente un tipo de

discrimen por razón de sexo que viola la dignidad del ser humano. Igualmente nocivo es cuando el acecho sexual interfiere irrazonablemente en el trabajo o crea un ambiente hostil o intimidante.

Independientemente de sus orígenes sociológicos y su vinculación con actitudes y costumbres patriarcales, no podemos aceptar este tipo de conducta en ninguna de sus manifestaciones. No olvidemos que formamos parte de una generación en que las mujeres quieren incorporarse a las estructuras políticas, sociales, económicas y culturales en igualdad de condiciones. En muchos hogares contribuyen con sus esfuerzos y talentos al sostenimiento de la familia. También son un componente importante de la fuerza trabajadora y ocupan posiciones en todos los niveles en la jerarquía gubernamental y privada, y participan activamente en todos los aspectos de la vida del país. En nuestra Rama Judicial ellas aportan en forma significativa a impartir justicia en todas las funciones adjudicativas, incluso no solamente en este Tribunal sino también en los tribunales de instancia. Desde este Estrado Apelativo nos corresponde endosar y reconocer estos logros y proteger los derechos políticos y económicos obtenidos por todas nuestras compañeras con mucho esfuerzo y perseverencia.

## III

Conceptualizado el hostigamiento sexual como una manifestación del discrimen por razón de sexo, la Ley Núm. 100, *supra*, contiene los criterios de responsabilidad aplicables al patrono que incurre en violación. Contrario a la experiencia en Estados Unidos, esta ley impone responsabilidad al patrono en todos los casos de hostigamiento sexual por sus agentes, supervisores o representantes. Independientemente del tipo de hostigamiento sexual, la citada ley impide que un patrono establezca *condiciones o privilegios* o *"limite* o *clasifique* sus empleados *en cualquier forma* que tienda a privar a una persona de oportunidades de empleo o que afecten su status como empleado. . .". (Énfasis suplido.) 29 L.P.R.A. sec. 146. Cualquier tipo de *condición* o

*privilegio*, o cualquier tipo de limitación que afecte a un empleado por razón de su sexo está proscrito por el estatuto y el patrono es responsable por la violación en que incurrió o en que incurrieron sus supervisores y agentes. Como es el patrono quien ejerce el mayor control sobre los supervisores y quien establece las reglas en el lugar del trabajo, la legislación le impone responsabilidad sobre los actos de aquellos a quienes seleccionó para dirigir las operaciones.

Esta norma de responsabilidad ha sido refrendada por el legislador en la ley que declara el discrimen por sexo una práctica ilegal del empleo, Ley Núm. 69 de 6 de julio de 1985 (29 L.P.R.A. sec. 1321 *et seq.*), y la que amplía la prohibición del hostigamiento sexual en el trabajo, Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. sec. 155 *et seq.*). Ambos estatutos son instrumentos adicionales que tiene la mujer obrera para protegerse en los talleres de trabajo. La Ley Núm. 17, *supra*, extiende la protección contra el hostigamiento entre empleados y por personas no empleadas por el patrono.

En estas circunstancias procede que, a la luz de estas disposiciones, esta Curia defina el ámbito de la responsabilidad patronal y no posponga para otra ocasión unos pronunciamientos sobre el área más neurálgica de la legislación contra el discrimen. Nos preocupa que el análisis inconcluso de la Parte IV de la opinión del Tribunal pueda dar lugar a una interpretación del derecho aplicable a base de los criterios de responsabilidad patronal sugeridos en *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). Nuestra legislación no provee estas dos (2) vertientes de responsabilidad y la indefinición del Tribunal significa que tendrá que ser en otra ocasión donde nos pronunciemos sobre estos extremos. Aunque la opinión reconoce los derechos de la mujer trabajadora a no ser hostigada en el empleo, se queda corta al exponer los remedios disponibles para reparar los agravios.

Por las razones expuestas anteriormente, y sin adelantar criterios sobre la adjudicación en los méritos de la situación factual planteada ante nos, concurro con la opinión del Tribunal en que el foro de instancia se equivocó al resolver sumariamente que

lo expuesto por la peticionaria no constituía fundamento para una demanda al amparo de la Ley Núm. 100, *supra.* En estas circunstancias, corresponde devolver el caso a dicho foro para una dilucidación plena de los hechos que determine si hubo hostigamiento sexual según definido anteriormente y para permitirle al patrono aportar prueba que rebata la presunción establecida por el estatuto.

—O—

Opinión disidente emitida por el Juez Presidente Señor Pons Núñez.

El 18 de septiembre de 1985 se presentó ante la consideración del Tribunal Superior de Puerto Rico, Sala de Carolina, una demanda en daños y perjuicios contra Supermercados Amigo, Inc., su aseguradora y el Sr. Ángel Negrón. Básicamente se alegó que la demandante Carmen L. —menor de edad y representada por sus padres en esta acción— fue víctima de hostigamiento sexual en el empleo por parte del aquí recurrido, el Sr. Ángel Negrón, quien fungía como gerente de la codemandada Supermercados Amigo, Inc., en la sucursal donde la demandante trabajaba a tiempo parcial. Se alegó afirmativamente que los hechos constitutivos de hostigamiento sexual por el empleado señor Negrón contaron con la alegada anuencia, aprobación y tolerancia expresa o tácita del patrono Supermercados Amigo, Inc. Sostuvieron los demandantes que la menor fue obligada a renunciar a su empleo en dicha empresa debido al clima opresivo y de persecución en su contra creado por el señor Negrón, todo ello en contravención con lo dispuesto en la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. secs. 146–151), y en el Art. II, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1.

Oportunamente la parte demandada negó las alegaciones de la demanda y levantó defensas afirmativas. Posteriormente se comenzó el descubrimiento de prueba. Se tomaron deposiciones, tanto a Carmen L. como al codemandado Sr. Ángel Negrón. Así las cosas, los demandados presentaron solicitud de sentencia sumaria parcial. Adujeron que aun tomando como cierto el

testimonio bajo juramento expuesto por la demandante en su deposición, los hechos relatados por ésta no constituían hostigamiento sexual en el empleo, por lo que no existía controversia real sobre hechos materiales que impidieran dictar sentencia sumaria en cuanto a dicha reclamación. Conjuntamente con la referida solicitud acompañaron varias porciones de la deposición tomada a la demandante, así como evidencia de múltiples sanciones disciplinarias tomadas contra ésta como consecuencia de un alegado patrón reiterado de descuadres en sus funciones como cajera.

Los demandantes se opusieron a la solicitud de los demandados y, a su vez, solicitaron que se dictara sentencia sumaria parcial a su favor. Adujeron que en el presente caso no existía controversia real sobre hechos materiales y que "como cuestión de estricto derecho" procedía que se dictara sentencia sumaria en favor de los demandantes.

Trabada así la controversia y luego de celebrada una vista para discutir ambas solicitudes, el tribunal a quo dictó sentencia sumaria a favor de la parte demandada y desestimó la demanda. Determinó el tribunal que no existía controversia sustancial en cuanto a los hechos que dieron origen a la reclamación judicial y que la naturaleza superficial de los incidentes involucrados en este caso no eran suficientes para sustentar una causa de acción por hostigamiento sexual en el empleo.

Inconformes, los demandantes acudieron ante nos mediante escrito de apelación. Oportunamente consideramos el recurso como de revisión y acordamos revisar.

I

De un análisis minucioso y detallado de las deposiciones, declaraciones juradas y demás prueba documental obrante en autos surge que los hechos no controvertidos del caso ante nos son los que se exponen a continuación.(1)

---

(1) Consistentemente hemos resuelto que cuando se trata únicamente de prueba documental, este Tribunal está en la misma posición que el foro de instancia al evaluar la

La demandante comenzó a trabajar para Supermercados Amigo a mediados de 1984 en la sucursal de la Avenida 65 de Infantería en Río Piedras, Puerto Rico. Al comenzar a trabajar, ésta tenía diecisiete (17) años de edad, por lo que fue necesario, y se obtuvo, un permiso para emplearla del Departamento del Trabajo y Recursos Humanos de Puerto Rico. Completó el período probatorio y continuó siendo empleada a jornada parcial con la demandada. Luego de trabajar por un período aproximado de siete (7) meses en la sucursal de la Avenida 65 de Infantería, y a solicitud suya, fue transferida a la sucursal de Ciudad Universitaria. El Sr. Ángel Negrón se desempeñaba como gerente de la misma.

Alegadamente, una vez que Carmen L. inició sus labores en Ciudad Universitaria, el señor Negrón no sólo la miraba insistentemente sino que a menudo le decía "piropos", los cuales la incomodaban. En la deposición oral tomada a Carmen L., según surge de la transcripción de la misma, ésta relató varios de los alegados incidentes que ocurrieron entre ambos. Veamos.

El primer incidente ocurrió apenas transcurrida una semana del traslado. La demandante se disponía a entrar a la oficina del Supermercado y el señor Negrón se le acercó. Mientras le tocaba la cabeza, la saludó diciéndole "Ay chiquilla linda". La demandante expresó que a ese incidente en particular no le dio mayor importancia.

El segundo incidente descrito por la demandante se refiere a que el señor Negrón le manifestaba que no se maquillara porque se veía mejor sin maquillaje. Estos comentarios se los hacía el codemandado Sr. Ángel Negrón, una o dos (2) veces en semana.

El tercer incidente tuvo lugar cuando Carmen L. fue a buscar su cartera a la oficina. El señor Negrón estaba allí, sentado en una silla giratoria detrás del mostrador. Al entrar la demandante, éste inclinó la silla hacia atrás, se colocó las manos sobre la cabeza y le

misma. *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204 (1986); *Pueblo v. Uriel Álvarez*, 112 D.P.R. 312, 318 (1982); *Castrillo v. Maldonado*, 95 D.P.R. 885, 889 (1968); *West India Mach. v. Srio. de Hacienda*, 89 D.P.R. 115 (1963); *Central Igualdad, Inc. v. Srio. Hacienda*, 83 D.P.R. 45 (1961).

dijo: "'Ay Carmencita tengo dolor de cabeza, quítamelo . . .'." Apéndice del Escrito de Apelación, pág. 17. Ella le contestó que allí había pastillas y salió enseguida. Mientras salía, él le indicó que no le gustaban las pastillas.

El cuarto incidente que relató la demandante se suscitó cuando ésta se proponía "ponchar" su tarjeta de asistencia. Sintió que alguien abría la puerta del almacén y resultó ser el señor Negrón. Éste se dirigió al ponchador y se acercó a la demandante, le tocó el pelo, la cara y el cuello, y le dijo: "'qué bonita eres'." Apéndice del Escrito de Apelación, pág. 18. Ella decidió ponchar su tarjeta antes de tiempo y salió del almacén. De inmediato fue a la oficina e informó lo sucedido al señor Correa, subgerente de la sucursal, y además señaló que su preocupación era que el señor Negrón pudiera ponerse más agresivo. Ante esta situación, el Sr. Ángel Negrón se reunió con el señor Correa y con ella para excusarse por cualquier malentendido que hubiese surgido en relación con el incidente del almacén. La conducta objetada no volvió a repetirse. Señaló que con posterioridad a ese incidente trabajó más tiempo y ganó más dinero.

Carmen L. manifestó que el señor Negrón constantemente le "echaba" piropos. Con frecuencia le señalaba lo bien que le quedaba el color rojo. Indicó que en una ocasión le comentó sobre lo bien que le quedaba cierto color de lápiz labial. Además, expresó que el señor Negrón le decía tantas "boberías" que ella no le prestaba atención. También la demandante expresó bajo juramento que el señor Negrón nunca la invitó a salir con él, en ningún momento le insinuó o dijo que quería tener relaciones sexuales con ella, no la invitó a salir ni le dijo nunca un piropo vulgar u ofensivo. Que no era persona de decirle palabras muy chocantes y que la frase "chiquilla bonita" no la ofendía. Por el contrario, expresó que el comentario más insinuante que le había hecho el señor Negrón había sido el relacionado con el color de lápiz labial que en cierta ocasión ella tenía puesto.

Por otro lado, surge de la prueba documental no controvertida, presentada por el demandado en apoyo 'de su solicitud de sentencia sumaria, que durante el período en ·que la demandante

trabajó para la codemandada Supermercados Amigo, Inc. estaba en vigencia un procedimiento para el control de eficiencia de los cajeros. Conforme a estos términos, una cajera que incurriera en un patrón reiterado de descuadres mayores o menores de dos dólares ($2.00) durante cualquier período de tiempo podía ser objeto de acciones disciplinarias, incluso el despido. Como cuestión de hecho, un sólo descuadre de quince dólares ($15.00) o más, o la combinación de dos (2) descuadres que alcancen o sobrepasen dicha cantidad dentro de cualquier mes calendario, podría dar fundamento a la suspensión o al despido del cajero. Los descuadres de dos dólares ($2.00) de más o dos dólares ($2.00) de menos no se tomaban en cuenta para disciplinar a una cajera.

La demandante, antes de trabajar en la sucursal de Ciudad Universitaria, donde se desempeñaba como gerente el Sr. Ángel Negrón, había sido objeto de varias acciones disciplinarias por descuadres, incluso una suspensión de empleo y sueldo por una semana. Mientras se desempeñó como cajera para la demandada y en un período no mayor de ocho (8) meses, incurrió en diez (10) descuadres. Los últimos dos (2) ocurrieron en la sucursal de Ciudad Universitaria y en un período de aproximadamente dos (2) meses. Lo anterior fue expresamente aceptado bajo juramento por Carmen L. durante la toma de su deposición.

## II

En primer término, arguyen los recurrentes que erró la ilustrada sala de instancia al disponer de este caso mediante el mecanismo de sentencia sumaria. Sostienen que en el presente caso existe una controversia sustancial sobre hechos materiales que impiden que se dicte sentencia sumaria como cuestión de derecho. No les asiste la razón.

Dispone la Regla 36.3 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) que podrá dictarse sentencia sumaria en cualquier caso "si las alegaciones . . . [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren que no hay controversia

real sustancial en cuanto a ningún hecho material y que como cuestión de derecho debe dictarse sentencia sumaria . . .".

Como es sabido, el mecanismo de sentencia sumaria constituye un remedio rápido y eficaz que permite a los tribunales dictar sentencia sin necesidad de celebrar un juicio en su fondo en aquellos casos en que de los documentos acompañados con la solicitud surja que no existe una legítima controversia con relación a los hechos materiales del litigio y sólo reste aplicar el derecho. *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1987); *Mercado Riera v. Mercado Riera*, 87 D.P.R. 566 (1963).

Corresponde, pues, a la parte que solicite se dicte sentencia sumaria "la obligación de demostrar, fuera de toda duda, la inexistencia de una controversia real sobre todo hecho pertinente que a la luz del derecho sustantivo aplicable determinaría una sentencia a su favor como cuestión de ley". *Tello, Rivera v. Eastern Airlines*, supra, pág. 86; *Roth v. Lugo*, 87 D.P.R. 386 (1963). Demostrado lo anterior, la parte opositora podrá, como regla general, derrotar la solicitud presentando contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 721 (1986).

Una vez sometida la moción de sentencia sumaria y su oposición, los tribunales deben concederla cuando el promovente ha establecido su derecho con claridad y ha quedado demostrado que la otra parte no tiene derecho a recobrar bajo cualesquiera circunstancias que resulten discernibles de las alegaciones no impugnadas por la evidencia en apoyo de la solicitud. *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 720. En esas circunstancias no existe una genuina controversia en cuanto a los hechos materiales del litigio y la sentencia sumaria procederá como cuestión de derecho.

En casos en que se presenten contramociones de sentencia sumaria en las cuales ambas partes sostengan que no existe una genuina controversia de hechos y que el derecho les asiste, los tribunales deben considerarlas de forma separada, sin que ello signifique que necesariamente deba dictarse sentencia

sumariamente a favor de una de las partes. *Rains v. Cascade Industries, Inc.*, 402 F.2d 241 (3er Cir. 1968); *McKenzie v. Sawyer*, 684 F.2d 62 (Cir. D.C. 1982); *Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211 (8vo Cir. 1983); 10A *Wright and Miller, Federal Practice and Procedure: Civil 2d* Sec. 2720 (1983). En esos casos los tribunales deben evaluar cada solicitud individualmente y determinar, en cada caso particular, si procede que se dicte sentencia sumaria de acuerdo con los criterios que rigen la concesión de este tipo de remedio. *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10mo Cir. 1979); *Wright and Miller,* supra. Así, pues, cuando ninguna de las partes cumpla individualmente con su obligación de demostrar la inexistencia de una genuina controversia en cuanto a los hechos pertinentes que determinarían una sentencia a su favor como cuestión de ley, ambas mociones deben ser denegadas. *Roth v. Lugo*, supra; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Igual solución debe prevalecer en aquellos casos en que el tribunal no tenga ante sí la verdad sobre todos los hechos pertinentes al litigio.

No obstante, el hecho de que ambas partes sometan contramociones de sentencia sumaria crea una inferencia de que no existe otra evidencia a ser considerada además de la presentada por las partes en apoyo de sus solicitudes. Siendo ello así, en estos casos el tribunal está compelido a evaluar únicamente la evidencia presentada por las partes al determinar si existe una genuina controversia de hechos a ser dirimida en una vista en su fondo. *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690 (10mo Cir. 1981); *Securities & Exch. Com'n v. Am. Commodity Exch.*, 546 F.2d 1361 (10mo Cir. 1976); *H. B. Zachry Company v. O'Brien*, 378 F.2d 423 (10mo Cir. 1967); *Wright and Miller*, supra. Cuando de la evaluación de la evidencia presentada surja que las partes coinciden en la exposición de los hechos materiales dispositivos del caso así como en la teoría legal relevante al mismo, el hecho de que las partes hayan presentado contramociones de sentencia sumaria es demostrativo de la inexistencia de una genuina controversia de hechos. *Bricklayers, etc., U. 15, Fla. v. Stuart Plaster. Co., Inc.*, 512 F.2d 1017 (5to Cir. 1975); *Thyssen Plastik*

*Anger KG v. Induplas, Inc.*, 576 F.2d 400 (1er Cir. 1978); *United Nuclear Corp. v. Cannon*, 553 F. Supp. 1220 (1982). En esos casos debe dictarse sentencia a favor de la parte que en derecho proceda.

En el presente caso surge de las mociones presentadas por las partes que éstas coinciden en cuanto a que los hechos que dan lugar a la presente acción son los relatados por la codemandante Carmen L. en la deposición oral que le fuera tomada. Ninguna de las partes intentó controvertir dichos hechos. Por el contrario, ambas partes apoyaron sus respectivas solicitudes principalmente en los hechos relatados por dicha codemandante. Sus diferencias versaban únicamente sobre la aplicación e interpretación del derecho con relación a los hechos expuestos por ésta. Ello de por sí demuestra la inexistencia de una genuina controversia en cuanto a los hechos materiales del litigio.

Por otro lado, la deposición tomada a Carmen L. fue detallada y minuciosa. En la misma se relatan todos los hechos en los cuales se fundamenta el alegado hostigamiento sexual. Tenía, pues, el tribunal ante sí, de forma incontrovertida, todos los hechos necesarios para poder resolver la controversia conforme a derecho. En tales circunstancias, estaba en orden disponer del caso mediante el mecanismo de sentencia sumaria.[2]

---

[2] Si bien es doctrina establecida que, como regla general, no deba dictarse sentencia sumaria en casos que supongan cuestiones de interés público, ello no quiere decir que dicha norma deba ser aplicada de forma indiscriminada. La cuestión descansa en la sana discreción del tribunal y dependerá del interés público involucrado así como de si el tribunal tiene ante sí todos los hechos materiales a la controversia de manera tal que resulte impracticable celebrar una vista en su fondo. Así lo hemos reconocido implícitamente en el pasado al refrendar la utilización del mecanismo de sentencia sumaria frente a reclamos de violaciones a derechos constitucionales de igual o similar magnitud al del presente caso. Véanse: *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975) (discrimen por razón de sexo); *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989) (discrimen por razón de ideas políticas). En igual sentido se expresa la jurisprudencia federal al utilizar el mecanismo de sentencia sumaria en casos de alegado hostigamiento sexual (*Scott v. Sears, Roebuck and Co.*, 605 F. Supp. 1047 (D. Ill. 1985)), así como en casos de otros alegados discrímenes. *Parker v. Federal Nat. Mortg. Ass'n*, 741 F.2d 975 (7mo Cir. 1984) (discrimen por razón de edad); *Hermes v. Hein*, 742 F.2d 350 (7mo Cir. 1984) (discrimen por razón de ideas políticas); *Holly v. City of Naperville*, 603 F. Supp. 220 (D. Ill. 1985) (discrimen por razón de raza y edad).

Aclarada la cuestión procesal involucrada en el presente caso, consideremos el aspecto sustantivo del mismo.

### III

La Constitución del Estado Libre Asociado de Puerto Rico expresamente prohíbe el discrimen por razón de sexo y garantiza a toda persona la igual protección de las leyes. En su Art. II, Sec. 1 prescribe en forma clara que:

La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo* de raza, color, *sexo*, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. (Énfasis suplido.) Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257.

En conformidad con el mandato constitucional que establece que las leyes "encarnarán estos principios de esencial igualdad humana" (Const. E.L.A., *supra*), nuestra Asamblea Legislativa ha desarrollado un ordenamiento jurídico integral que recoge los postulados expuestos en nuestra Constitución. Véanse: 4 Diario de Sesiones de la Convención Constituyente 2563 (1952); *García Pagán v. Shiley Caribbean, Etc.*, 122 D.P.R. 193 (1988); *Rivera Águila v. K-Mart de P.R.*, 123 D.P.R. 599 (1989). Específicamente en materia laboral nuestra Legislatura aprobó la Ley Núm. 100, *supra*, la cual prohíbe todo tipo de práctica discriminatoria en el empleo por razón de edad, raza, color, sexo, origen o condición social e ideas políticas y religiosas, a fin de garantizar los derechos recogidos en nuestra Carta de Derechos a todos los trabajadores.[3] En lo pertinente, su Art. 1 establece:

Todo patrono que despida, suspenda o *discrimine contra un empleado* suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o

---

[3] En igual sentido, véanse: Ley Núm. 3 de 13 de marzo de 1942, según enmendada, 29 L.P.R.A. sec. 467; Ley Núm. 69 de 6 de julio de 1985, según enmendada, 29 L.P.R.A. sec. 1321 *et seq.*

que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status como empleado, por razón de edad, según ésta se define más adelante, raza, color, *sexo*, origen social o nacional, condición social, ideas políticas o religiosas del empleado o solicitante del empleo:

(a) incurrirá en responsabilidad civil. (Énfasis suplido.) 29 L.P.R.A. sec. 146.

Recientemente —y a tono con lo antes expuesto— fue aprobada por nuestra Asamblea Legislativa la Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. sec. 155 *et seq.*) con el propósito de proscribir el hostigamiento sexual en el empleo, imponer responsabilidades y fijar penalidades. Básicamente esta ley dispone que el hostigamiento sexual en el empleo es una modalidad de discrimen por razón de sexo y que, por lo tanto, constituye una práctica ilegal e indeseable que atenta contra el principio constitucional establecido de que la dignidad del ser humano es inviolable. No obstante, la citada ley no es de aplicación a la presente controversia puesto que ésta fue aprobada con posterioridad a la fecha en que alegadamente ocurrieron los hechos en este caso.[4]

Ahora bien, la Ley Núm. 17, *supra*, revela la intención del legislador de considerar el hostigamiento sexual como una modalidad del discrimen por razón de sexo proscrito por nuestra Constitución y por la antes citada Ley Núm. 100. Precisamente uno de los motivos que tuvo el legislador al aprobar la Ley Núm. 17, *supra*, fue ampliar el esquema de protección trazado por el Estado contra el discrimen por razón de sexo. Véase Exposición de Motivos de la Ley Núm. 17, *supra*. Siendo ello así, procede considerar el hostigamiento sexual como una modalidad de discrimen por sexo prohibido por nuestra Constitución y por la Ley Núm. 100, *supra*.

---

[4] Del texto de la Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. sec. 155 *et seq.*), no surge que la misma tenga vigencia retroactiva. El Art. 3 de nuestro Código Civil dispone: "Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario." 31 L.P.R.A. sec. 3.

Toda vez que en nuestra jurisdicción no contamos con normas claras aplicables a la situación que nos ocupa, por su efecto persuasivo conviene examinar las doctrinas desarrolladas en la jurisdicción federal sobre el particular.

## IV

En la esfera federal se ha resuelto afirmativamente que el hostigamiento sexual constituye una modalidad del discrimen por razón de sexo prohibido por la Ley Federal de Derechos Civiles de 1964 (42 U.S.C. sec. 2000(a)–(h)); *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). Dicha ley prohíbe expresamente el discrimen en el empleo por razón de raza, color, religión, origen nacional y sexo.

Originalmente fue concebida para atender únicamente el problema de la discriminación racial. No obstante, la prohibición referente al sexo fue incluida durante el debate legislativo. De ahí que la intención del Congreso en torno al alcance de la ley en lo que a la discriminación por sexo se refiere no surja con claridad del historial de la misma. 122 Cong. Rec. 2548–2616 (1964). Sin embargo, ya para el 1971 el Tribunal Supremo de Estados Unidos delimitó su alcance en *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), al expresamente disponer que la intención de la ley era "eliminar toda barrera artificial, arbitraria e innecesaria, específicamente cuando dichas barreras, indudablemente operan para discriminar *a base de una clasificación de tipo racial o de otro tipo igualmente impermisible*". (Traducción y énfasis nuestros.)

Posteriormente, con la aprobación del *Equal Employment Opportunity Act* de 1972, se disipó toda duda al respecto, convirtiéndose la eliminación del discrimen sexual en una de las mayores prioridades del Congreso. Véase S. Rep. No. 92–415, 92d Cong., 1st Sess. 7, 1971. Así pues, en *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 esc. 13 (1978), el Tribunal Supremo de Estados Unidos se expresó en el sentido de que al adoptar una prohibición expresa contra el discrimen por sexo "el

Congreso tenía la intención de asestar un fuerte golpe a todo el espectro de tratamiento dispar que se da a hombres y mujeres como resultado de esterotipos sexuales". (Traducción nuestra.) Véase, además, *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7mo Cir. 1971).

En materia de hostigamiento sexual no fue hasta la decisión de *Williams v. Saxbe*, 413 F. Supp. 654 (D.C. 1976), donde por primera vez se resolvió un caso de forma favorable al reclamante y se le reconoció como una causa de acción específica. Con anterioridad a 1975 apenas existía como concepto legal. Sin embargo, con posterioridad a 1976 la jurisprudencia evolucionó rápidamente. Aun así, frecuentemente los tribunales inferiores se negaban a reconocer las causas de acción presentadas por empleados alegadamente hostigados sexualmente. *Corne v. Bausch and Lomb, Inc.*, 390 F. Supp. 161 (D. Ariz. 1975); *Miller v. Bank of America*, 418 F. Supp. 233 (N.D. Cal. 1976); *Tomkins v. Public Service Elec. & Gas Co.*, 422 F. Supp. 553 (D. N.J. 1976); *Fisher v. Flynn*, 598 F.2d 663 (1er Cir. 1979).

Como consecuencia de la falta de uniformidad existente en la adjudicación de estos casos y del rápido desarrollo de esta causa de acción, en 1980 la Comisión de Igualdad de Oportunidades de Empleo (en adelante, por sus siglas en inglés, E.E.O.C.) emitió unas guías, a modo de directrices, con el fin de ayudar a los tribunales en la dilucidación de estas controversias. Específicamente dichas guías consideran el hostigamiento sexual como una forma de discrimen por sexo prohibido por el Título VII de la Ley Federal de Derechos Civiles, *supra*. Igualmente proponen que se imponga responsabilidad absoluta (*strict liability*) a los patronos por los actos de sus empleados. Las mismas definen hostigamiento sexual de la manera siguiente:

(a) Avances sexuales que no son bien recibidos, solicitudes de favores sexuales y cualquier otra conducta física o verbal de naturaleza sexual, constituye hostigamiento sexual cuando: (1) aceptar tal conducta es explícita o implícitamente un término o condición para el empleo de un individuo, (2) aceptar o rechazar dicha conducta por parte de un individuo se utiliza como funda-

mento para tomar decisiones sobre empleo que afectan a tal individuo o (3) dicha conducta tiene el propósito o el efecto de interferir irrazonablemente con la realización del trabajo de un individuo o crear un ambiente de trabajo intimidante, hostil u ofensivo. (Traducción nuestra.)

Si bien las guías que adopta la E.E.O.C. no tienen fuerza vinculante para los tribunales (*General Electric Co. v. Gilber*, 429 U.S. 125 (1976)), a raíz de la aprobación de las guías de 1980 consistentemente se han reconocido, al menos, dos (2) modalidades a través de las cuales puede configurarse el hostigamiento sexual.

La primera de ellas es el llamado "hostigamiento sexual quid pro quo" o de pérdida de beneficios tangibles. Surge cuando el sometimiento o rechazo de avances o requerimientos sexuales se toma como fundamento para afectar un término o condición del empleo. De acuerdo con esta modalidad se requiere que el demandante pruebe que ha sido objeto de avances o se le han solicitado favores sexuales y que el sometimiento o rechazo a acceder a dichos avances o a la solicitud de favores sexuales fue el fundamento o la causa de una decisión adversa en cuanto a una condición, término o beneficio tangible en su empleo. *Simmons v. Lyons*, 746 F.2d 265 (5to Cir. 1984); *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77 (3er Cir. 1983); *Henson v. City of Dundee*, 682 F.2d 897 (11mo cir. 1982); *Bundy v. Jackson*, 641 F.2d 934 (Cir. D.C. 1981); *Miller v. Bank of America*, 600 F.2d 211 (9no Cir. 1979); *Garber v. Saxon Business Products, Inc.*, 552 F.2d 1032 (4to Cir. 1984); *Horn v. Duke Homes, Div. of Windsor Mobile Homes*, 755 F.2d 599 (7mo Cir. 1985); *Williams v. Civiletti*, 487 F. Supp. 1387 (D.C. 1980); *Heelan v. Johns-Manville Corp.*, 451 F. Supp. 1382 (D. Colo. 1978).

Así pues, para que pueda configurarse una causa de acción según esta modalidad, la parte demandante tiene el peso de establecer un caso prima facie de hostigamiento sexual en el que demuestre, mediante hechos específicos y no meras alegaciones, que ha sido objeto de avances sexuales y que el sometimiento o rechazo a los mismos fue la causa de una decisión adversa en

cuanto a una condición, término o beneficio tangible en su empleo. Una vez se estalezca un caso prima facie de discrimen, le corresponde al demandado demostrar una razón legítima que justifique válidamente los actos por los cuales se reclama. El demandante podrá entonces demostrar que la justificación aducida por el demandado es sólo un pretexto. *King v. Palmer*, 778 F.2d 878 (Cir. D.C. 1985); *Horn v. Duke Homes, Div. of Windsor Mobile Homes*, supra. En general, véanse: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

La segunda modalidad la constituye el llamado "hostigamiento sexual por ambiente hostil u ofensivo". De acuerdo con ésta, los avances sexuales o la solicitud de favores sexuales de que es objeto la persona tienen el efecto de interferir irrazonablemente con el desempeño de su trabajo o de crear en el mismo un ambiente intimidante, hostil u ofensivo. En estos casos no es necesario que se demuestre la pérdida de un beneficio económico o de una condición o término del empleo (*Meritor Savings Bank v. Vinson*, supra); sólo se requiere que la conducta de naturaleza sexual constituya un patrón reiterado que afecte adversamente la realización de su trabajo o su condición emocional. *Bundy v. Jackson*, supra; *Henson v. City of Dundee*, supra; *Katz v. Dole*, 709 F.2d 251 (4to Cir. 1983); *Jeppsen v. Wunnicke*, 611 F. Supp. 78 (D. Alaska 1985); *Zabkowicz v. West Bend Co.*, 589 F. Supp. 780 (E.D. Wis. 1984); *Coley v. Consolidated Rail Corp.*, 561 F. Supp. 645 (E.D. Mich. 1982); *Robson v. Eva's Super Market Inc.*, 538 F. Supp. 857 (N.D. Ohio 1982). Puede pues colegirse que según esta vertiente no es suficiente que la parte demandante establezca que fue objeto de avances sexuales o de solicitud de favores sexuales. Se requiere, además, que demuestre que dicha conducta fue tan severa y persistente que creó un ambiente hostil y abusivo en su empleo o que la afectó seriamente en la realización de su trabajo o condición emocional. *Meritor Savings Bank v. Vinson*, supra; *Henson v. City of Dundee*, supra; *Bundy v. Jackson*, supra.

A tales efectos, los tribunales han expresado uniformemente que no toda conducta de algún contenido sexual, aun proviniendo

de supervisores o empleados gerenciales, constituye hostigamiento sexual en el empleo. Por ello, prueba de actos ocasionales o aislados, o bien comentarios triviales de naturaleza sexual, no satisfacen los requisitos exigidos para que pueda configurarse este tipo de causa de acción. La conducta en cuestión debe ser ofensiva y persistente. *Downes v. F.A.A.*, 775 F.2d 288 (Fed. Cir. 1985). Los meros piropos no satisfacen estos requisitos. *Scott v. Sears, Roebuck and Co.*, 798 F.2d 210 (7mo Cir. 1986); *Ross v. Comsat*, 34 FEP Cases 260 (1984).

, Así, por ejemplo, en el caso de *Scott v. Sears, Roebuck and Co.*, supra, la demandante, mecánica de oficio, alegó que fue objeto de hostigamiento sexual porque tanto su supervisor como varios empleados compañeros de trabajo la habían invitado a salir en varias ocasiones; que un compañero de trabajo le dio una nalgada y que, al informárselo al supervisor de éste, le preguntó a la demandante qué obtendría él a cambio de hacer algo sobre la situación. La Corte de Apelaciones para el Séptimo Circuito determinó que los eventos, aún de haber ocurrido, no eran suficientes para establecer una causa de acción por hostigamiento sexual en el empleo.

En *Sand v. Johnson Co.*, 33 FEP Cases 716 (1982), el demandado, según indicó la reclamante, la invitaba a almorzar y a cenar con más frecuencia que a las demás delineantes, le envió flores cuando se enfermó mediante las cuales le expresó que se mantenía siempre pensando en ella, le regaló un reloj y hasta en una ocasión la invitó a cenar y *trató de abrazarla y besarla*. El Tribunal, aun tomando como ciertos los incidentes relatados por la reclamante, determinó que éstos no eran constitutivos de un patrón reiterado y ofensivo de conducta de naturaleza sexual ni constituían tampoco avances sexuales o la solicitud de favores sexuales tal y como lo estipula el Título VII de la Ley Federal de Derechos Civiles, *supra.*

En igual sentido, en *Downes v. F.A.A.*, supra, la Corte de Apelaciones para el Circuito federal determinó que el hecho de que el demandado hiciera comentarios a la demandante sobre lo bien que le lucía el vestido, lo bien que le quedaba su nuevo corte

de pelo *o aun le hubiese tocado el pelo y la cabeza*, por sí solos no constituían el patrón reiterado y ofensivo de conducta de naturaleza sexual, ni los avances sexuales o solicitud de favores sexuales que le darían a ésta fundamento para una causa de hostigamiento sexual en el empleo.

Por otro lado, como ejemplo de circunstancias en que expresamente se ha reconocido que existe un patrón de conducta de naturaleza sexual lo suficientemente persistente y ofensiva como para sostener una reclamación por hostigamiento sexual en el empleo conforme a la modalidad en consideración, podemos observar los casos de *Bundy v. Jackson*, supra; *Henson v. City of Dundee*, supra, y *Coley v. Consolidated Rail Corp.*, 561 F. Supp. 645 (D. E. Mich. 1982).

En *Bundy v. Jackson*, supra, pág. 940, la demandante, especialista en rehabilitación, había sido objeto de continuos avances sexuales de naturaleza ofensiva así como de comentarios denigrantes de parte de sus supervisores. Como ejempleo de lo anterior se destaca el hecho de que uno de sus supervisores, de apellido Burton, la llamaba constantemente para solicitarle que pasara la tarde de trabajo con él en su apartamento y la cuestionaba constantemente sobre sus hábitos y costumbres sexuales. Asimismo, otro de los supervisores, de apellido Garney, le solicitó en varias ocasiones que lo acompañara a un motel y hasta a un viaje a las Bahamas y le cuestionaba frecuentemente sobre sus preferencias sexuales. A esos efectos, la señora Bundy se querelló al supervisor de éstos, quien hizo caso omiso de sus quejas y en su lugar le dijo que "cualquier hombre con uso de razón querría violarla". Más aún, éste le solicitó que tuviera relaciones sexuales con él en su apartamento. El Tribunal de Apelaciones para el Circuito de Columbia determinó que dicha conducta era lo suficientemente severa para crear un ambiente hostil y abusivo en el empleo.

De igual manera, en *Coley v. Consolidated Rail Corp.*, supra, la demandante, mientras trabajaba para la demandada, fue objeto por parte de sus supervisores de constantes comentarios despectivos relativos al tamaño de su busto. Su jefe inmediato llevaba un

récord de sus períodos menstruales en el calendario de la oficina, le hacía continuos comentarios de naturaleza ofensiva acerca de su estado de ánimo —en relación a sus supuestos períodos menstruales— y le preguntaba constantemente cuándo haría algo agradable por él. De igual manera se comportaban los demás supervisores. El Tribunal determinó que dicha conducta había creado un ambiente hostil y ofensivo de trabajo lo suficientemente severo y persistente para afectar seriamente el bienestar emocional de la demandante y el desempeño de sus funciones en el trabajo.

Por último, en *Henson v. City of Dundee*, supra, se trataba de una empleada del Departamento de la Policía de la ciudad de Dundee, a la cual el jefe de la Policía le hacía comentarios y bromas vulgares de naturaleza sexual constantemente. Así, por ejemplo, en una ocasión éste le indicó que si ella deseaba asistir a la Academia de la Policía debía sostener relaciones íntimas con él. Determinó el Tribunal que estos hechos conjuntamente con todo lo sucedido con anterioridad eran suficientes para constituir el hostigamiento sexual en el empleo según la modalidad de un ambiente hostil u ofensivo que le impedía desempeñarse plenamente en su trabajo.

En 1986 el Tribunal Supremo de Estados Unidos se pronunció por vez primera en relación con este tipo de reclamación al resolver el caso de *Meritor Savings Bank v. Vinson*, supra. En este caso el Tribunal Supremo ratificó los pronunciamientos jurisprudenciales de los tribunales inferiores y acogió expresamente las doctrinas discutidas con anterioridad. Allí se trataba de una demanda presentada por Vinson, empleada del banco demandado por alrededor de cuatro (4) años, contra el banco y su supervisor Taylor. Durante el juicio, la demandante testificó *que había sido compelida por su supervisor a mantener relaciones íntimas no deseadas en unas cuarenta (40) o cincuenta (50) ocasiones, algunas de ellas a la fuerza.* Testificó, además, que su supervisor le coqueteaba frente a otros empleados y que continuamente la seguía al baño de damas con la intención de enfrentársele cuando ella estuviera sola. Indicó, finalmente, que

ello le había causado serios trastornos emocionales y que nunca se lo notificó al banco por miedo a perder su empleo. El Tribunal Supremo resolvió que Vinson había sido víctima de hostigamiento sexual. Al así hacerlo, adoptó las normas expuestas en las guías emitidas por el E.E.O.C. antes citadas.

Concluyó el Tribunal Supremo federal que el hostigamiento sexual constituye una modalidad de discrimen por razón de sexo, prohibido por el Título VII de la Ley Federal de Derechos Civiles, *supra*. A esos efectos, aclaró que el lenguaje expuesto en el aludido Título VII no está limitado al discrimen con efectos económicos o tangibles. Por lo tanto, expuso que no se requiere que el demandante establezca que el alegado hostigamiento sexual le afectó en una condición o beneficio económico del empleo. Determinó que el mismo puede configurarse en casos en que la conducta de naturaleza sexual crea un ambiente de trabajo hostil o abusivo.

No obstante, y a tono con lo antes expuesto, estableció que no toda conducta de algún contenido sexual es suficiente para sostener una alegación de hostigamiento sexual por ambiente hostil y abusivo. Para que la misma pueda prevalecer, la conducta debe ser lo suficientemente severa y consistente como para alterar las condiciones del empleo y crear un ambiente de trabajo abusivo.

Por otro lado, resolvió que de acuerdo con las guías emitidas por la E.E.O.C. los tribunales, al enfrentarse a este tipo de causa de acción, deben examinar la totalidad de las circunstancias involucradas en el caso, entre las que se encuentran evaluar la naturaleza de los avances sexuales así como el contexto en el cual los alegados incidentes ocurrieron. A tales efectos, determinó que el hecho de que la relación sexual fuera voluntaria, en el sentido de que la parte demandante no fue forzada a participar en contra de su voluntad, no es defensa en estos casos. Lo verdaderamente determinante es que los requerimientos o avances sexuales no

hayan sido bienvenidos o bien recibidos (*unwelcome*), no si la participación fue "voluntaria".(5)

En vista del desarrollo jurisprudencial de esta materia en el ámbito federal, de alto valor persuasivo en nuestra jurisdicción, consideremos los méritos del presente caso.

V

Primeramente, al considerar los reclamos de la naturaleza del que aquí nos ocupa, debemos examinar la totalidad de las circunstancias presentes en cada caso en particular. Al así hacerlo, se requiere una evaluación detenida de la naturaleza de las alegadas proposiciones o avances sexuales, el contexto en que supuestamente ocurrieron, su frecuencia e intensidad, la conducta y circunstancias personales del afectado así como una serie de otros factores humanos igualmente relevantes al análisis de estos casos. Para ello, no podemos hacer abstracción de la realidad histórica, cultural, sicológica y social de nuestro pueblo. No debemos olvidar que el complejo total de hábitos, costumbres, arte, religión y lenguaje de nuestro pueblo, con todas sus virtudes y defectos, responden a una realidad histórico-social distinta a la de otras sociedades. *Tampoco podemos presumir que nuestras particulares reglas personales de conducta son las imperantes en toda nuestra sociedad donde existen grandes diferencias socioculturales, educativas y económicas*. De ahí que debemos tener sumo cuidado al adoptar doctrinas jurídicas sobre comportamiento humano desarrolladas en otras jurisdicciones con realidades y trasfondo cultural distinto al nuestro. Debemos considerar la manera en que se da la interacción entre los miembros de

---

(5) El Tribunal expresamente declinó establecer una regla definitiva sobre la responsabilidad de los patronos en estos casos. Sin embargo, expresó su conformidad con la posición de la Comisión de Igualdad de Oportunidades de Empleo (E.E.O.C., por sus siglas en inglés) sobre la aplicabilidad de los principios de agencia (*agency*) como guías a este respecto. Para una crítica sobre el particular, véase Nota, *Between the Boss and a Hard Place: A consideration of Meritor Savings Bank, FSB v. Vinson and The Law of Sexual Harassment*, 67 Boston Univ. Law Rev. 445 (1987). Por no considerarlo necesario para la solución del presente caso, nos abstenemos de considerar el aspecto relacionado con la responsabilidad patronal en este tipo de caso.

nuestra sociedad y la realidad que permea nuestro diario vivir. Esto es, al evaluar la conducta y las expresiones de que se trate debemos tomar en consideración cómo la sociedad realmente la considera y si chocan con las vivencias cotidianas. Lo contrario acarrearía un precedente jurisprudencial totalmente desvinculado de nuestra realidad existencial.

Con estas consideraciones en mente, examinemos los hechos particulares que dieron lugar a la presente reclamación. En primer término, notamos que los incidentes acaecidos en este caso no constituyen avances de naturaleza sexual o solicitudes de favores sexuales que puedan configurar una causa de acción por hostigamiento sexual en el empleo. El hecho de que el codemandado señor Negrón le expresara a Carmen L. lo bonita que era o "chiquilla linda", que en *una* ocasión al decirlo le tocó la cabeza, que le dijera que no se maquillara, que tal o cual color de ropa le quedaba mejor o que la piropeara no puede considerarse como una conducta de naturaleza sexual capaz de sostener una reclamación por hostigamiento sexual en el empleo, *especialmente cuando ella admitió que ello le halagaba, no le ofendía, que el señor Negrón no era persona de usar palabras muy "chocantes" y que nunca usó de un piropo vulgar u ofensivo.* A lo sumo dicha conducta solamente denota una serie de actos que pueden ser de mal gusto en un ambiente de trabajo adecuado y que constituyen una falta de consideración hacia una persona. No puede, sin embargo, dar lugar a una reclamación de este tipo pues no tiene la naturaleza severa y persistente que jurisprudencialmente se ha considerado que configura hostigamiento sexual por ambiente hostil y ofensivo.

Restan el incidente relativo a tocarle el pelo, la cara y el cuello, así como el alegadamente ocurrido cuando la codemandante se proponía buscar su cartera en la oficina del supermercado. Aun cuando pudiéramos considerar los mismos como permeados de algún tipo de proposición sexual, no convenimos en que dichos incidentes puedan considerarse como el tipo de avance o requerimiento sexual hostigante *necesario para configurar esta causa de acción.* Adviértase, además, que la propia codemandante

admitió que el señor Negrón le decía tantas "boberías" que en muchas ocasiones ella no le prestaba atención, que nunca la invitó a salir con él, que nunca le insinuó o dijo que quería tener relaciones sexuales con ella y que nunca le dijo un piropo vulgar u ofensivo. Por el contrario, expresó que el comentario más insinuante había sido uno relacionado al color de lápiz labial que en una ocasión ella utilizaba. Pero hay más aún; la propia demandante manifestó *que su preocupación consistía en que el señor Negrón se pusiera más agresivo*. Eso que le preocupaba, ella lo evitó o disipó totalmente al quejarse de la conducta del *señor Negrón* y *éste excusarse y manifestarle que había sido un malentendido. A partir de ese momento no ocurrieron incidentes adicionales de naturaleza que puedan dar lugar a la acción instada.* Rehusamos considerar miradas insistentes como conducta sexual. También rehusamos embarcarnos en determinar judicialmente lo que constituye una mirada "sospechosa". Creemos evidente la fragilidad de asentar un fallo judicial en la determinación de que una mirada resulta "sospechosa".

En tales circunstancias, no podemos convenir con la alegación de los demandantes en el sentido de que los hechos que dan lugar a esta acción *demuestran el tipo de avance o requerimiento sexual necesario para configurar una reclamación por hostigamiento sexual aun cuando, como hemos dicho, la conducta sea de mal gusto y constituya una falta de consideración personal.*

No obstante, aun cuando se considere que implícitamente la conducta es de naturaleza sexual, ciertamente la misma no es de tal grado abusiva, severa y persistente como para crear un ambiente ofensivo y hostil en el trabajo que la afectara seriamente en la realización del mismo o en su estado emocional. La conducta y sus efectos en este caso dista mucho de la conducta y los hechos en *López Campos v. Garage Isla Verde, Inc.*, 126 D.P.R. 166 (1990), voto particular.

De hecho, cabe señalar que tampoco hay fundamento alguno para entender que los dos (2) descuadres que motivaron la renuncia tuvieron como razón el ambiente existente en su lugar de empleo, pues *debe recordarse que ya ella había sido disciplinada*

*anteriormente por el gran número de descuadres en que había incurrido en otra sucursal de la demandada y que no habían ocurrido situaciones como las que ella alega* ocurrieron en la última sucursal en la que trabajó.

Por otro lado, toda vez que los demandantes no lograron establecer los elementos mínimos que configuran una causa de acción por hostigamiento sexual en el empleo, la presunción de discrimen contra el patrono contenida en el Art. 3 de la Ley Núm. 100, *supra*, 29 L.P.R.A. sec. 148, no es de aplicación a la presente controversia. Si bien dicha presunción tiene el efecto de variar el peso de la prueba, imponiendo así sobre el patrono la obligación de producir evidencia y persuadir al juzgador a los efectos de que el despido no fue discriminatorio (*Ibáñez v. Molinos de P.R., Inc.*, 114 D.P.R. 42 (1983); *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985)), ello presupone que el demandante presente evidencia en apoyo del hecho básico en el cual descansa el hecho presumido. Regla 13 de Evidencia, 32 L.P.R.A. Ap. IV; E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, Cap. III, pág. 40. Precisamente, en el presente caso los hechos en que descansan los demandantes en apoyo de sus alegaciones no son suficientes para establecer el hecho básico en que se funda la presunción contenida en la Ley Núm. 100, *supra*. Para que las inferencias que hacen los tribunales sean válidas constitucionalmente, debe existir una conexión racional entre los hechos probados y el derecho inferido. *Tot v. United States*, 319 U.S. 463–467 (1943); *Colon-Rosich v. People of Puerto Rico*, 256 F.2d 393 (1er Cir. 1958). Así pues, concluido el hecho de que la codemandante no fue hostigada sexualmente por el codemandado, Sr. Ángel Negrón, la presunción establecida en virtud de la antes mencionada ley no surte efecto alguno.

Una reflexión final en cuanto *al desarrollo futuro* de nuestra jurisprudencia en este campo. Convenimos con la mayoría en que en el pasado se cometieron serios abusos mediante censurables y crudos hostigamientos sexuales. Pero no estamos de acuerdo en que ello haya sido realmente una manifestación de nuestros tradicionales valores culturales. Sus causas radican en las iniqui-

dades económicas y políticas que ahogaban nuestros más preciados valores culturales. Así como nos esforzamos en superar esas iniquidades, compartimos el laudable afán de proscribir y erradicar el pernicioso hostigamiento sexual en nuestra sociedad, tanto en sus antiguas y crudas manifestaciones como en sus nuevas y refinadas modalidades. Pero al hacerlo no debemos caer en el error de propugnar normas que interfieran y enfríen la natural y saludable interacción y relación entre los sexos. Tenemos que cuidarnos de distinguir entre conducta natural y saludable y el hostigamiento: de no convertir el natural enamoramiento en conducta artificiosa sujeta a reglamentación judicial. No queremos una sociedad de licenciosos y sátiros, pero tampoco de misántropos y misóginos.

Por los fundamentos antes expuestos, confirmaríamos la sentencia dictada por el Tribunal Superior, Sala de Carolina, que declaró con lugar la solicitud de sentencia sumaria presentada por los demandados en el presente caso.