# 98 DTA 178

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL IV DE AGUADILLA Y MAYAGUEZ**

JACKELINE MENDEZ LORENZO
Demandante-Apelada

v.

DIGITAL SWITCH CORP. OF P.R. (DSC OF PUERTO RICO)
Demandada-Apelante

Núm. KLAN-96-00934

San Juan, Puerto Rico, a 23 de abril de 1998

Panel integrado por su Presidente, el Juez Rossy García
y los Jueces Martínez Torres y Rodríguez García

Martínez Torres, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Mediante un recurso de apelación acude ante nos Digital Switch Corporation of P.R. (en adelante *"DSC"*) y solicita la revocación de la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Aguadilla (Hon. Yamil Suárez Marchán, Juez), que declaró con lugar una acción por despido injustificado y discriminatorio incoada en su contra. Con el beneficio de la comparecencia de ambas partes procedemos a resolver las controversias planteadas.

### I

Jaqueline Méndez Lorenzo (en adelante *"Méndez Lorenzo"*) comenzó a trabajar para DSC, en la planta de Aguada, el 13 de agosto de 1986. Transcripción de la Vista en su Fondo Celebrada el 20 de diciembre de 1994 (en adelante *"Transcripción I"*), pág. 6 y Apéndice del Escrito de Apelación, pág. 1 y Apéndice del Escrito de Apelación, pág. 9, Determinación de Hechos 1. A partir del 1990 Méndez Lorenzo fue objeto de cuatro incidentes de alegado hostigamiento sexual. Para esa época se desempeñaba como secretaria en el Departamento de Recursos Humanos de la Empresa.

El primero de estos incidentes ocurrió a principios del mes de febrero de 1990. Mientras Méndez Lorenzo estaba sentada en la maquinilla, Rafael Gutiérrez (en adelante *"Gutiérrez"*), Gerente del Departamento de Recursos Humanos, se le acercó por la espalda y le *"friccionó"* con ambas manos los hombros. Méndez Lorenzo, con un movimiento brusco, le quitó las manos de los hombros. Transcripción I, págs. 10-11.

Algunos días más tarde ocurrió el segundo de los incidentes. El mismo consistió en una conducta similar por parte de Gutiérrez. En esta ocasión, Méndez Lorenzo se viró hacia Gutiérrez y con su mirada le mostró su indignación. *Id.*, págs. 12-13.

El tercer incidente ocurrió el 8 de febrero de 1990. En esta ocasión, Gutiérrez nuevamente colocó

sus manos en los hombros de Méndez Lorenzo y las deslizó por la espalda hacia el *"brassiere"*. En ese momento, Méndez Lorenzo se dirigió a la Oficina de Recursos Humanos. Allí le narró a María Acevedo (en adelante *"Acevedo"*), Administradora de Recursos Humanos de la empresa, los tres incidentes antes señalados. Solicitó además que hablara con Gutiérrez y le comunicara que ella no aceptaba que le tocara el cuerpo. *Id.*, págs. 13-15.

El 20 de febrero de 1990, hubo una conversación entre Méndez Lorenzo y Gutiérrez, en presencia de Acevedo, en la que Méndez Lorenzo le expresó a Gutiérrez la incomodidad que le producía que la tocara. *Id.*, págs. 19-21. Surge del expediente que a partir de esta conversación cesó la conducta de Gutiérrez.

Posteriormente, la empresa trasladó sus oficinas a Aguadilla. Es allí donde ocurre el último de los incidentes de alegado hostigamiento sexual. Durante el receso de mediodía, Robert Michalik (en adelante *"Michalik"*) le pidió pasara un trabajo a máquina. Mientras Michalik le explicaba qué debía hacer, puso la mano izquierda sobre el hombro derecho de Méndez Lorenzo. Inmediatamente ésta le indicó que no aceptaba que la tocaran. *Id.*, págs. 23-25. Nunca ocurrió otro incidente similar. *Id.*, págs. 105-106.

Dos años después, el día 14 de abril de 1992, Michalik y Acevedo se reunieron con Méndez Lorenzo para darle una orientación verbal debido al número de ausencias que había tenido. Méndez Lorenzo se negó a firmar un documento que hacía referencia a dicha orientación. Momentos más tarde Gutiérrez le inquirió porqué se negaba a firmar el mismo. Comenzó una discusión entre ellos que culminó en el despido de Méndez Lorenzo. *Id.*, págs. 27-32 y Apéndice del Escrito de Apelación, pág. 9, Determinación de Hechos 1. Al momento del despido Méndez Lorenzo devengaba un salario de $5.87 por hora, equivalente a $234.80 semanales. Determinación de Hechos 2.

El 29 de mayo de 1992, Méndez Lorenzo instó una demanda contra DSC en la que alegó haber sido despedida sin justa causa y discriminatoriamente por hostigamiento sexual en su modalidad de ambiente hostil. El Tribunal de Primera Instancia, Sala Superior de Aguadilla, dictó el 13 de marzo de 1996 sentencia a su favor y ordenó a DSC el pago de lo siguiente:

*"a. Al amparo de la Ley 80 por Despido Injustificado la cantidad de $2,113.80 correspondiente a la mesada.*

*b. Por concepto de los daños ocasionados por el Despido Discriminatorio bajo la Ley 100 la cantidad de $85,000.00, incluyendo el doble de penalidad que provee la ley.*

*c. Por concepto de honorarios de abogado se ordena el pago de $2,000.00, para una suma total de $170,000.00. Apéndice del Escrito de Apelación, pág. 13. Dicha sentencia fue notificada a las partes 5 días más tarde."*

El 20 de marzo de 1996, DSC presentó *"Moción de Determinaciones de Hechos Adicionales"*. Mediante Resolución emitida el 5 de julio de 1996, el tribunal sentenciador declaró con lugar la misma. El 2 de abril de 1996, DSC presentó *"Moción de Reconsideración"*, la cual fue declarada sin lugar el 9 de abril del mismo año.

Inconforme con la sentencia del Tribunal de Primera Instancia, DSC presentó este recurso de apelación el 16 de septiembre de 1996. En el mismo señala que erró el tribunal sentenciador al determinar que Méndez Lorenzo fue objeto de actos constitutivos de hostigamiento sexual en su modalidad de ambiente hostil, cuando tales acciones como mucho dan derecho a una mesada por despido injustificado. ■

Luego de recibir una transcripción del juicio, así como los alegatos de las partes, celebramos vista oral el 27 de marzo de 1998. Atendidos detenida y cuidadosamente los alegatos presentados por las partes, la transcripción del juicio, sus argumentos en la vista oral, así como las leyes y la jurisprudencia aplicable, se confirma la sentencia apelada en lo referente al despido injustificado, modificando la cuantía concedida por concepto de mesada, y se revoca lo referente al despido discriminatorio.

## II

El Artículo 1 de la Ley Núm. 80 de 30 de mayo de 1976 (en adelante *"Ley 80"*), según enmendada, 29 L.P.R.A. sec. 185a, establece que todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo que sea despedido de su cargo sin que haya mediado justa causa, tendrá derecho a recibir del patrono, además del sueldo devengado:

*(a) el salario correspondiente a un mes por concepto de indemnización si el despido ocurre dentro de los primeros cinco (5) años de servicio; a dos (2) meses si el despido ocurre luego de los cinco (5) hasta los quince (15) años de servicio; y a tres (3) meses si el despido ocurre luego de los quince (15) años de servicio; y (b) una indemnización progresiva adicional equivalente a una semana por cada año de servicio."*

El Artículo 2 de la referida Ley 80 (*Id.* sec. 185b), dispone, en su parte pertinente, que se entenderá por justa causa para el despido de un empleado:

*"(a) Que el obrero siga un patrón de conducta impropia y desordenada.,*

*(b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.*

*(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*

*(d) Cierre total, temporero o parcial de las operaciones del establecimiento.*

*(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.*

*(f) Reducciones en el empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.*

*No se considerará despido por justa causa el que se hace por el mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento de la empresa. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley."*

El precepto antes transcrito no es una lista taxativa de circunstancias que constituyen justa causa para el despido, ya que *"la Ley no pretende ni puede, considerada la variedad de circunstancias y normas de los múltiples establecimientos de trabajo ser un código de conducta conteniendo un lista de faltas claramente definidas y la sanción que corresponde a cada una y en cada instancia, si ha de ser reprimenda, suspensión o despido. Esa es opción del patrono que puede adoptar reglas y reglamentos razonables que estime necesarios para el funcionamiento de la empresa."* Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 542 (1979).

La Ley 80, *supra,* no favorece el despido de un empleado como sanción a la primera falta. A tenor con el estatuto, únicamente es permisible el despido por primera o única ofensa en aquellas ocasiones en que la misma es *"de tal seriedad o naturaleza que revele una actitud o detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento".* Srio. del Trabajo v. I.T.T., *supra,* pág. 544. Véase, además, *Delgado Zayas v. Hospital Interamericano,* Opinión de 5 de diciembre de 1994, **94 J.T.S. 149**, pág. 500.

Por otra parte, el Artículo 8 de la Ley 80, (*supra,* sec. 185h), *"crea una presunción de que el*

*despido del empleado fue injustificado. Le toca al patrono rebatir dicha presunción. Si el patrono opone como defensa afirmativa el haber mediado justa causa para el despido, le corresponde probar, mediante la preponderancia de la evidencia, que el despido estuvo justificado." Srio. del Trabajo v. I.T.T., supra.*

En cuanto a los honorarios de abogado la Ley 80 en su Artículo 11 (29 *supra* sec. 185k(b)), dispone que cuando el tribunal crea que el despido fue sin justa causa, ordenará al patrono depositar una suma a tal efecto no menor del quince porciento (15%) del total de la compensación del trabajador.

## III

El hostigamiento sexual en el empleo es una forma de discrimen por razón de sexo y como tal constituye una práctica ilegal e indeseable que atenta contra la cláusula constitucional que establece que la dignidad del ser humano es inviolable, y proscribe todo discrimen por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas. Véanse Const. de P.R., Art. II, sec. 1; Art. 1 de la Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. sec. 155); *Rodríguez Meléndez v. Sup. Amigo, Inc.,* 126 D.P.R. 117, 124 (1990); *Sánchez v. A.E.E.,* Sentencia de 9 de abril de 1997, **97 J.T.S. 45,** pág. 849.

Este tipo de discrimen puede manifestarse de diversas formas, entre ellas: *"1) manifestaciones simples como piropos, guiñadas e insinuaciones sexuales indeseadas; 2) expresiones de agresión sexual más directas y más violentas como frases de cariño no invitadas, pellizcos, roces corporales no solicitados, invitaciones insistentes a salidas que no se desean, besos, abrazos y apretones forzados; y 3) casos extremos de violencia física y psíquica, que incluyen la violación sexual." Id.*, citando a Muñoz Vázquez y Silva Bonilla, *El Hostigamiento Sexual: Sus Manifestaciones y Características en la Sociedad, en los Centros de Empleo y los Centros de Estudio,* Centro de Investigaciones Sociales, Facultad de Ciencias Sociales, U.P.R., 1985, pág. 3. El hostigamiento sexual en el empleo, no importa la forma en que se manifieste, *"infringe la inviolabilidad del ser humano y constituye un claro discrimen contra el hombre o mujer en el campo del trabajo. Obstaculiza la labor de la persona, privándola del goce y disfrute de una vida plena a la cual tiene derecho todo ser humano."* Exposición de motivos de la Ley Núm. 17 de 22 de abril de 1988 (en adelante *"Ley 17"*), Leyes de Puerto Rico, 1988, pág. 80.

La Asamblea Legislativa de Puerto Rico, siguió el modelo del Título VII de la Ley de Derechos Civiles Federal de 1964 (42 U.S.C.A. secs. 2000e *et seq*.), al aprobar la referida Ley 17, *supra*, para establecer el hostigamiento sexual como una práctica ilícita del trabajo. *Id.*, pág. 81. Se trata de estatutos similares, por lo cual la jurisprudencia federal interpretativa de dicha ley tiene alto valor persuasivo.

Hostigar es perseguir, molestar o incitar con insistencia para que alguien haga algo. Real Academia Española, *Diccionario de la Lengua Española,* Madrid, Espasa-Calpe, S.A., 1992, pág. 795. Hostigamiento Sexual en el empleo según el Artículo 3 de la Ley Núm. 17, *supra*, sec. 155b, consiste en: cualquier tipo de acercamiento sexual no deseado, requerimientos de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual, cuando se da una o más de las siguientes circunstancias:

*"(a) Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.*

*(b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.*

*(c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo."*

El artículo antes transcrito no proscribe todo tipo de hostigamiento, molestia o incitación en el empleo, sino aquél de índole sexual. De igual forma el artículo recoge las dos modalidades

jurisprudencialmente reconocidas de hostigamiento sexual. Los incisos (a) y (b) se refieren al hostigamiento equivalente o *quid pro quo* (algo a cambio de algo). El inciso (c) se refiere a la modalidad de hostigamiento sexual por ambiente hostil o intimidante. *Delgado Zayas v. Hospital Interamericano, supra*, pág. 501.

El hostigamiento sexual *quid pro quo* se produce cuando la aceptación o el rechazo de los avances o requerimientos sexuales se utilizan como fundamentos para modificar los beneficios del empleo. *Id.*; *Rodríguez Meléndez v. Sup. Amigo, Inc., supra. Véase, además, Hicks* v. *Gates Rubber Co.,* 833 F. 2d 1406, 1413 (10th Cir. 1987). *"The proposed exchange of job benefits for sexual favors suggests the name 'quid pro quo'."* Lindemann & Kaude, *Sexual Harassment in Employment Law,* Washington, The Bureau of National Affairs, Inc., 1992, pág. 7. Se requiere, por tanto, que el promotor de la acción pruebe la solicitud de favores sexuales y que el rechazo a los mismos tuvo como consecuencia afectar los términos, condiciones o privilegios en el empleo. *Rodríguez Meléndez v. Sup. Amigo, Inc., supra.*

Surge de las alegaciones en este caso que la demandante-apelada, Méndez Lorenzo, no reclamó a base de la modalidad *quid pro quo*, sino por crearse un ambiente hostil. Así lo aceptó su abogado en la vista oral efectuada.

A diferencia del hostigamiento sexual *quid pro quo*, la modalidad de ambiente hostil se produce cuando la conducta sexual para con un individuo tiene el efecto de interferir irrazonablemente con su trabajo o de crear un ambiente intimidante, hostil u ofensivo. *Rodríguez Meléndez v. Supermercado Amigo, Inc., supra*, pág. 130. *"To prevail on a hostile work environment cause of action, a plaintiff must establish, among other things, that she was subjected to unwelcome sexual harassment based upon her sex that affected a term, condition or privilege of employment." Jones v. Clinton,* No. LR-C-94290, slip op. pág. 28 (D. Ark. April 1, 1998), citando a *Callanan v. Runyun,* 75 F. 3d 1293, 1296 (8th Cir. 1996).

El ambiente hostil u opresivo no tiene que manifestarse en gestos, lenguaje o actividad sexual y el hostigador puede ser cualquier empleado, sin importar su posición en el lugar de empleo. *Delgado Zayas v. Hospital Interamericano, supra.* El daño ocasionado por el hostigamiento no tiene que ser de tipo económico. *Id.*, citando a *Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986). Tampoco es necesario que el ambiente hostil e intimidante afecte el bienestar sicológico de la víctima, ya que :

*"un ambiente hostil e intimidante, aunque no afecte seriamente el bienestar sicológico de la víctima, puede afectar el funcionamiento y la efectividad de la víctima en el empleo, desalentar al empleado a permanecer en el empleo y dificultarle el que progrese en su carrera. Si el ambiente puede ser razonablemente percibido como uno hostil y en efecto es percibido por la víctima como un ambiente hostil o abusivo o que atente contra su dignidad, no hay necesidad de que también sea sicológicamente dañino."*

*Delgado Zayas v. Hospital Interamericano, supra*, pág. 502, citando a *Harris v. Forklift Systems, Inc.*, 510 U.S., 126 L. Ed. 2d 295, 302 (1993). Como podemos observar, es de real importancia en una reclamación de este tipo la prueba acerca del *"ambiente". "Evidence of a general work atmosphere therefore --as well as evidence of specific hostility directed toward the plaintiff-- is an important factor in evaluating that claim. Indeed, "such evidence could be critical to a plaintiff's case, where a claim of harassment cannot be established without a showing of the isolated indicia of a discriminatory environment". Hicks v. Gates Rubber, Co., supra, citando a Vinson v. Taylor,* 753 F. 2d 141 (D.C. Cir. 1985).

Ahora bien, la determinación de qué constituye un ambiente hostil o abusivo es un asunto cuya dilucidación requiere mucho cuidado. Debido a la naturaleza misma de las relaciones humanas se trata de situaciones donde es necesario evaluar minuciosamente la totalidad de las circunstancias. *Id.* Ante esta realidad, la jurisprudencia elaboró un estándar que toma en cuenta la hostilidad del ambiente de trabajo desde la vertiente subjetiva de la víctima y desde la vertiente objetiva de la persona razonable. *Delgado Zayas v. Hospital Interamericano, supra*, comentando *Harris v. Forklift, supra*. El Artículo 4 de la Ley 17 (29 L.P.R.A. sec. 155c), recoge la norma antes expuesta. De acuerdo con la misma, dispone que para determinar *"si la alegada conducta constituye hostigamiento sexual en el empleo se considerará la totalidad de las circunstancias en que ocurrieron los hechos. La determinación de la*

*legalidad de una acción se hará basada en los hechos de cada caso en particular."*

Recientemente el Tribunal Supremo Federal señaló que *"the objective severity of harassment should be judged from the perspective of a reasonable person in plaintiff's position, considering 'all the circumstances' that inquiry requires careful consideration of the social context in which particular behaviour occurs and is experienced by its target." Oncale v. Sundowner Offshore Services. Inc.,* 118 S. Ct. 998, 1002 (1998); Véase *Harris v. Forklift Systems. Inc., supra.* A fin de cuentas, señaló el Tribunal Supremo de Puerto Rico en *Rodríguez Meléndez v. Sup. Amigo. Inc., supra,* pág. 132:

*"la pregunta de umbral en toda reclamación de acuerdo con esta modalidad es si la alegada conducta constitutiva de hostigamiento fue lo suficientemente severa y ofensiva como para alterar las condiciones del empleo y crear un ambiente de trabajo abusivo. Este examen debe realizarse atendiendo a la totalidad de las circunstancias y, muy en particular, a factores tales como la naturaleza de la conducta alegada, su frecuencia e intensidad, contexto en el cual ocurre, período de tiempo y su extensión, y la conducta y circunstancias personales del demandante".* [Citas omitidas]

Véanse además *Saxton v. American Tel. & Tel.. Co.,* 10 F. 3d 526, 533 (7th Cir. 1993); *Sprague v. Thorn Americas Inc.,* 129 F. 3d 1355, 1366 (10th Cir. 1997); y *Harris v. Forklift, supra,* pág. 302.

Con miras a erradicar esta indeseable forma de discrimen la Ley Núm. 100 de 30 de junio de 1959 (en adelante *"Ley 100"),* 29 L.P.R.A. sec. 146, impone penalidades a todo patrono que discrimine en el empleo por razón de edad, raza, color, sexo, origen social o nacional, condición social, ideas políticas o religiosas, o estado civil. Dicho estatuto, en su parte pertinente, dispone que dicho patrono:

*"(a) Incurrirá en responsabilidad civil*

*(1) por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo;*

*(2) o por una suma no menor a cien (100) dólares ni mayor de mil (1,000) dólares, a discreción del tribunal, si no se pudieran determinar los daños pecuniarios;*

*(3) o el doble de la cantidad de los daños ocasionados si ésta fuera inferior a la suma de cien (100) dólares; y*

*(b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa no menor de cien (100) dólares ni mayor de quinientos (500), o cárcel por un término no menor de treinta (30) días ni mayor de noventa (90) días, o ambas penas, a discreción del tribunal."*

Además de lo anterior, la última oración del Artículo 1 de la Ley 100, *id.,* establece que el tribunal podrá ordenar al patrono que reponga en su empleo al trabajador. Es de esperar que ya que el propósito medular de esta legislación es que el trabajador disfrute de su empleo sin sufrir discrimen, el remedio apropiado al despido por discrimen sea la reposición en el empleo, siempre que sea posible. *López Vicil v. I.T.T. Intermedia, Inc.,* Opinión de 4 de abril de 1997, **97 J.T.S. 42,** pág. 838.

Por último, el Artículo 4 de la Ley 100 (29 L.P.R.A. § 149), dispone en forma mandatoria que en toda sentencia dictada contra un patrono a tenor con esta ley, se le impondrán a éste las costas, así como una suma razonable para honorarios de abogado que nunca será menor de cien (100) dólares. La Ley 100, *supra,* no define qué se entenderá por honorarios razonables ni establece los criterios a utilizar en dicha determinación. En ausencia de disposición legislativa a tal efecto, el Tribunal Supremo dispuso que de ordinario, *"la cuantía que podrá recibir el abogado de un trabajador victorioso en una reclamación bajo la Ley Núm. 100 será el veinticinco porciento (25%) de la indemnización base concedida al trabajador." López Vicil v. I.T.T. Intermedia, Inc.,* **97 J.T.S. 104,** opinión de 26 de junio de 1997, pág. 1254. No obstante, en aquellas situaciones en que el abogado estime que las circunstancias particulares del caso justifican recibir una cuantía mayor en concepto de honorarios, *"vendrá obligado a presentar memorando juramentado en el que detalle las horas trabajadas y la tarifa a cobrarse por hora." Id. "El abogado del demandante tiene el peso de la prueba en demostrar que las horas y su tarifa son razonables." Id.,* pág. 1255.

## IV

Es norma reiteradamente establecida que la apreciación de la prueba realizada por el tribunal sentenciador gozará de gran respeto y deferencia, ya que éste es quien tiene la oportunidad de ver y observar los testigos mientras deponen, sus gestos, dudas y contradicciones. A partir de ello, es un principio cardinal que el foro apelativo no intervendrá con las determinaciones de hechos del tribunal sentenciador a menos que exista error manifiesto o éste haya actuado movido por prejuicio, parcialidad o pasión. Así lo espresó el Tribunal *Supremo en Benítez Guzmán v. García Merced,* 126 D.P.R. 302, 308 (1990):

*"Se impone un respeto a la aquilatación de credibilidad del foro primario en consideración a que 'sólo tenemos... récords mudos e inexpresivos'. Esas apreciaciones deben ser objeto de gran deferencia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto que nos mueva a intervenir."* [Citas omitidas]

Véase además *Méndez Rodríguez v. Morales Molina,* Opinión de 15 de noviembre de 1996, **96 J.T.S. 149**, pág. 347; *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8, 14 (1987); *Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357, 365 (1982).*

No obstante, tales determinaciones no son inmutables. El arbitrio del juzgador, aunque respetable y merecedor de deferencia, no es absoluto. La apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. *Méndez Rodríguez v. Morales Molina, supra.* Véase, además, *Vda. de Morales v. De Jesús Toro,* 107 D.P.R. 826, 829 (1978).

En este caso nos vemos obligados a intervenir con las determinaciones de hechos, no debido a que el tribunal sentenciador haya actuado con prejuicio, parcialidad, pasión, ni porque haya error manifiesto en las mismas, sino debido a que las determinaciones de hechos, en lugar de contener hechos concretos lo que contienen son conclusiones de derecho. Por ejemplo, la sentencia expresa que la conducta de Gutiérrez y Michalik creó un ambiente hostil y represivo de trabajo para Méndez Lorenzo. Sin embargo, no hace claro cuáles fueron los actos constitutivos o hechos que produjeron dicho ambiente. Por esta razón, al analizar la conducta de dichos empleados gerenciales, hemos escudriñado el récord de la forma más favorable a la demandante-apelada, pero no encontramos tales actos en la prueba aportada en juicio. Un examen sereno, desapasionado y minucioso de la prueba desfilada ante el Tribunal de Primera Instancia nos convence de que la determinación a que llegó dicho foro --que la conducta de Gutiérrez y Michalik creó un ambiente hostil de trabajo para Méndez Lorenzo-- no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba y, en consecuencia, no debe prevalecer. Véase *Sanabria v. Sucn. González,* 82 D.P.R. 855, 997 (1961).

Sostiene la demandante-apelada que sufrió hostigamiento sexual en su modalidad de ambiente hostil durante dos años, desde febrero de 1990 hasta la fecha del despido. Según ella, una vez finalizados los incidentes relatados en la primera parte de esta sentencia, el comportamiento de sus supervisores para con ella cambió. Ahora, apenas le hablaban, cuando lo hacían era de forma *"áspera"* y se sentía que la presionaban en su trabajo. Transcripción I, págs. 21-22. Tampoco le contestaba los buenos días y hacía muchas alusiones a cada error que cometía. *Id.*, pág. 19. Así mismo, señala que al trasladarse la empresa a Aguadilla, a pesar de que le habían asegurado que el traslado no afectaría su persona en ningún aspecto, la colocación de su escritorio cambió. Estaba colocado fuera de la oficina de Gutiérrez, con las demás secretarias. *Id.*, págs. 22-23. En otra ocasión, Gutiérrez la detuvo colocándole, sin tocarla, un puntero de madera frente a la barriga. *Id.*, pág. 97.

Esta conducta hostigante se extendió, enfatiza la demandante-apelada, incluso a las evaluaciones. Méndez Lorenzo, demandante-apelada, fue evaluada en su desempeño como empleada mientras trabajaba en DSC en cuatro ocasiones desde 1989 a 1991. Apéndice del Escrito de Apelación, págs. 18, 113-115, 116-119, 120-123, y 124-129. En las primeras tres se concluyó que su desempeño excedía los requisitos *("Exceeds Requirements")* de la empresa, mientras que en la última de éstas, del 26 de junio de 1991, solamente cumplía con los requisitos *("Meets Requirements'")*. *Id.* Arguye que la diferencia en la evaluación fue uno de los eventos dirigidos a crear un ambiente opresivo u ofensivo, ya que es poco probable que un empleado que siempre había sido evaluado sobre el promedio, de un día a otro cambie su desempeño a uno promedio.

Considerando la totalidad de la circunstancias del caso, no es posible sostener que la conducta a que fue sometida Méndez Lorenzo fue lo severa, frecuente o amenazante como para sostener una reclamación por ambiente hostil. De mayor importancia es que Méndez Lorenzo no estableció de qué forma los actos antes señalados afectaron el desempeño de sus labores.

La conducta hostil o *"áspera"* a la que se refiere Méndez Lorenzo, de acuerdo al récord, no fue de tal magnitud y extensión que afectara el desempeño de sus labores. Véase *Delgado Zayas v. Hospital Interamericano, supra,* pág. 502. El hecho de que en las nuevas facilidades el escritorio de Méndez Lorenzo estuviera fuera de la oficina de Gutiérrez no se debe a otra cosa que a una reubicación del personal de acuerdo a la configuración del nuevo local. Por otro lado, la ausencia ocasional de un saludo o que en una ocasión en tres años le impidieran el paso con un puntero, demuestran a lo sumo que los supervisores de Méndez Lorenzo se comportaron ocasionalmente en forma grosera, no que existiera un ambiente hostil, según este término ha sido definido en la jurisprudencia. Por último, difícilmente puede crear un ambiente hostil el señalarle a un empleado sus errores, para que los corrija. Esa es la razón de ser de la supervisión.

De igual forma, aun concediendo que los incidentes con Gutiérrez y Michalik sean ciertos, los mismos ocurrieron dos años antes del despido y cesaron una vez Méndez Lorenzo señaló su incomodidad. Se trata de conducta indudablemente inapropiada, pero de eventos relativamente aislados que no permiten establecer la creación de un ambiente que afectara decisivamente el desempeño de sus labores. Sin duda alguna una empleada en la posición de Méndez Lorenzo podía sentirse incómoda, pero debido a lo aislado de los incidentes y a que éstos cesaron, no es posible arguir que crearon un ambiente ofensivo u hostil de empleo. Cf., *Sprague v. Thorn Americas, Inc.*, *supra*, en que se resolvió que incidentes de hostigamiento en el transcurso de 16 meses no eran lo suficientemente severos como para constituir un ambiente hostil de trabajo. ■

Por otra parte, surge del expediente que en 1991 DSC cambió el método de evaluación de empleados. Determinación de Hechos 34. Señaló Acevedo en su testimonio que como consecuencia de ello la evaluación de muchos empleados, no sólo la de Méndez Lorenzo, se afectó. Empleados cuya evaluación anteriormente señalaba que su desempeño excedía los requisitos, ahora tan sólo cumplían con los mismos, a pesar de que se esmeraban en el cumplimiento de sus labores como siempre. Véase Transcripción de la Vista en su Fondo celebrada el 21 de diciembre de 1994 (en adelante *"Transcripción II"*), págs. 32-35. En las evaluaciones posteriores a los incidentes con Gutiérrez y Michalik, incluyendo la del 26 de junio de 1991, a Méndez Lorenzo se le concedieron aumentos de sueldo. Véase Apéndice del Escrito de Apelación, págs. 120 y 124. Así pues, advertimos que el cambio en la fraseología de la evaluación no afectó negativamente a Méndez Lorenzo.

Como señala el Tribunal Supremo Federal en *Oncale v. Sundowner Offshore Services, Inc., supra*, págs. 1002-1003, el Título VII --y por analogía la Ley 100 de Puerto Rico-- no establece un *"código general de modales"* (*"general civility code"*) en el empleo. *"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment --that a reasonable person would find hostile or abusive-- is beyond Title VII's purview." Id.*, citando a *Harris v. Forklift Systems. Inc.*, *supra.*

En resumen, este Tribunal concluye que la demandante-apelada no probó una conducta tan severa y ofensiva como para alterar sus condiciones de empleo y crear un ambiente hostil de trabajo. Por ello, erró el Honorable Tribunal de Primera Instancia, Sala Superior de Aguadilla, al imponer responsabilidad a DSC bajo la Ley 100, *supra.*

## V

Procede determinar si el despido de Méndez Lorenzo, demandante-apelada, fue por justa causa. Surge de la transcripción del juicio que el día 14 de abril de 1992, Michalik y Acevedo se reunieron con Méndez Lorenzo para darle una advertencia verbal debido a la cantidad de ausencias que había tenido. Méndez Lorenzo se negó a firmar el aviso de recibo de la advertencia, por entender que las ausencias habían sido justificadas con certificados médicos. Comenzó entonces una discusión entre Gutiérrez y Méndez Lorenzo que terminó en el despido de esta última. Transcripción I, págs. 27-32; y Transcripción II, págs. 46-47, 86-87. Las versiones acerca de lo que en dicha reunión ocurrió varían en cuanto a quién se comportó inadecuadamente. *Id.* Sostiene Méndez Lorenzo que Gutiérrez, al

inquirirle por qué se negaba a firmar la orientación verbal, estaba *"muy molesto, muy nervioso"*, y que al despedirla estaba furioso. Transcripción I, pág. 32. En cambio, tanto Acevedo como Gutiérrez señalaron en su testimonio que era Méndez Lorenzo quien estaba alterada. Según Acevedo, Méndez Lorenzo utilizó, al dirigirse a Gutiérrez, una voz *"ruda"* y le gritaba. Transcripción II, pág. 46. Igualmente, Gutiérrez sostuvo que Méndez Lorenzo estaba gritando. *Id.*, pág. 87.

No obstante, esta discrepancia, aun si aceptáramos la versión de Gutiérrez que postula que el proceder de la demandante-apelada no fue el apropiado, no se justificaba su despido. Varias razones militan a favor de esta conclusión. En primer lugar, ésta no es una de las situaciones incluidas en el Artículo 2 de la Ley 80, *supra*, como constitutiva de justa causa para despido del empleo. En segundo lugar y más importante aún, es que de acuerdo al *"Manual del Empleado de DSC"* (en adelante *"Manual"*), no procedía el despido. Dicho Manual establece que *"es la intención de DSC considerar cada caso basado en sus propios méritos, de acuerdo al suceso específico y la calidad de labor realizada en el pasado."* Apéndice del Escrito de Apelación, pág. 77. Dentro de las violaciones de tipo I, el Manual incluye en el inciso (a): *"El llegar tarde o ausentarse en exceso."* Apéndice del Escrito de Apelación, pág. 80. Finalmente dispone que las violaciones de tipo I serán tratadas de la siguiente manera: (a) la primera violación con una advertencia verbal; (b) la segunda violación con una advertencia por escrito; (c) la tercera violación con un aviso por escrito o suspensión por un máximo de tres (3) días laborables sin sueldo; y (d) la cuarta violación con la teminación del empleo.

A tenor con el Manual no procedía el despido de Méndez Lorenzo, demandante-apelada, por una violación tipo I. Tratándose de una empleada ejemplar que en una ocasión se negó a firmar una primera advertencia verbal, no se justifica el despido. Se suma a ello que de acuerdo al procedimiento dispuesto en el mismo Manual el despido como sanción a ese tipo de violación era la última medida. Esto era conocido por el supervisor, quien se limitó a hacerle una advertencia verbal a Méndez Lorenzo. No es hasta que están enfrascados en la discusión, que Gutiérrez la despidió, no por sus ausencias sino *"por su actitud"*. Transcripción I, págs. 27-32; Transcripción II, págs. 46-47. De mayor importancia es el hecho de que el Manual no establece sanción alguna para aquellos empleados que se niegan a firmar la advertencia verbal. Entendemos que ante la situación fáctica de este caso, no existía justa causa para el despido. ■

## VI

La sentencia apelada estableció que correspondían a la demandante-apelada $2,113.80 por concepto de mesada por despido injustificado al amparo de la Ley 80, *supra*. Dicha cantidad es incorrecta.

La demandante-apelada trabajó para DSC durante 6 años. A tenor con el Artículo 1 de la Ley 80, *supra*, Méndez Lorenzo tiene derecho a una indemnización igual a dos (2) meses de sueldo más una indemnización progresiva de una semana adicional por cada año de servicio. El sueldo semanal era $234.80, lo que significa $939.20 mensuales. Por tanto, la mesada correspondiente es $3,287.20. Dicha cantidad se divide en: (a) $1,878.40 por los dos (2) meses de sueldo; y (b) $1,408.80 de indemnización por los seis años de servicios prestados a la compañía.

## VII

Resta determinar si erró el Tribunal de Primera Instancia al imponerle a DSC el pago de $2,000.00 por concepto de honorarios de abogado.

Reiteradamente se ha resuelto que la partida de honorarios de abogado concedida por un tribunal sentenciador, *"no se variará en apelación, salvo que la misma resulte excesiva, exigua o constituya un abuso de discreción."* *Corpak, Art. Printing v. Ramallo Brothers*, 125 D.P.R. 724, 740 (1990). Véase, además, *Revlon Realistic, Inc. v. Las Américas Trust Co.*, Opinión de 15 de marzo de 1994, **94 J.T.S. 27**, pág. 11614. Además de ello, el Artículo 11 de la Ley 80, *supra*, sec. 185k (b), requiere que la cantidad impuesta por concepto de honorarios de abogado no sea menor del 15 porciento (15%) del total de la compensación del trabajador.

Debido a que la cuantía concedida por honorarios en este caso, considerada la naturaleza del mismo, no es exigua, no constituye un abuso de discreción y cumple con lo dispuesto en la Ley 80, *supra*, es obligación de este Tribunal respetar la determinación hecha por el Tribunal de Primera

Instancia.

## VIII

En virtud de todo lo anterior, se dicta sentencia modificando la indemnización concedida en la sentencia dictada por el Tribunal de Primera Instancia por concepto de mesada por despido injustificado al amparo de la Ley 80, *supra*, y revocando la partida concedida por despido discriminatorio al amparo de la Ley 100, *supra*. Corresponde a la demandante-apelada, Jaqueline Méndez Lorenzo, exclusivamente, una indemnización de $3,287.20 por concepto de mesada, más $2,000.00 de honorarios de abogado.

Lo acordó y ordena el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 98 DTA 178

1. En la alternativa, sostiene la demandada-apelante que, de existir un ambiente hostil de empleo, erró el Tribunal de Primera Instancia al conceder la partida por daños sin tomar en consideración que la demandante-apelada incumplió con su obligación de mitigar los daños sufridos. Debido a las conclusiones a que llegamos en esta sentencia, no es necesario considerar este señalamiento.

2. Por supuesto, Méndez Lorenzo tenía derecho a demandar por tales incidentes bajo el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, pero no lo hizo dentro del período prescriptivo aplicable. Lo único que resolvemos en este recurso es que Méndez Lorenzo no podía demandar por hostigamiento sexual en el empleo ya que no se cumplen los requisitos establecidos en el Artículo 3 de la Ley Núm. 17, *supra*.

3. El Tribunal Supremo en *Padilla Colón v. Centro Gráfico del Caribe, Inc.,* Opinión de 4 de marzo de 1998, **98 J.T.S. 21**, resolvió que no concederá indemnización simultáneamente bajo la Ley 80, *supra*, y la Ley Núm. 3 del 13 de marzo de 1942 (29 L.P.R.A. sec. 469), conocida como *"Ley para la Protección de Madres Obreras"*, sino que en los casos en que proceda la aplicación de ambos estatutos, los tribunales concederán el remedio que proceda bajo una u otra ley, a base de lo que sea más beneficioso para la trabajadora. Como en este caso estamos revocando la indemnización concedida bajo la Ley 100, *supra*, no tenemos que resolver si aplica la norma expuesta en *Padilla Colón, supra*.